1  GARRICK A. HOLLANDER – State Bar No. 166316
   ghollander@wcghlaw.com
2  **WINTHROP COUCHOT**
   **GOLUBOW HOLLANDER, LLP**
3  660 Newport Center Drive, Fourth Floor
   Newport Beach, CA 92660
4  Telephone: (949) 720-4100
   Facsimile: (949) 720-4111
5
6  General Insolvency Counsel for
   Debtor and Debtor-in-Possession
7
8              **UNITED STATES BANKRUPTCY COURT**

9              **NORTHERN DISTRICT OF CALIFORNIA**

10             **OAKLAND DIVISION**

11

12 In re:                              Case No.  16:31367-RE-11

13                                     Chapter 11 Proceeding
   XS RANCH FUND VI, L.P.,
14 a California limited partnership,   **DEBTOR'S DISCLOSURE STATEMENT**
                                       **IN SUPPORT OF DEBTOR'S AMENDED**
15                                     **CHAPTER 11 PLAN OF**
                                       **REORGANIZATION**
16         Debtor and
           Debtor-in-Possession.       DATE:      [TBD]
17                                     TIME:      [TBD]
                                       PLACE:     Courtroom 201
18                                                1300 Clay Street, 2nd Floor
                                                  Oakland, CA 94612
19

20

21

22

23

24

25

26

27

28

XS Ranch Disclosure Statement

# **TABLE OF CONTENTS**

**PAGE**

I.  INTRODUCTION ................................................................. 2

II.  DEFINITIONS AND RULES OF INTERPRETATION ................................. 4
    2.1  Definitions ......................................................... 4
    2.2  Rules of Construction ............................................... 19

III.  PLAN CONFIRMATION DEADLINES ........................................... 19
    3.1  Time and Place of the Confirmation Hearing .......................... 20
    3.2  Deadline for Voting for or Against the Plan ......................... 20
    3.3  Deadline for Objecting to the Confirmation of the Plan .............. 20
    3.4  Identity of Person to Contact for More Information Regarding the Plan .... 20
    3.5  Disclaimer .......................................................... 20

IV.  FACTUAL BACKGROUND OF THE DEBTOR ...................................... 21
    4.1  Description of the Debtor and Nature of Debtor's Business ........... 21
    4.2  The Transferred Property ............................................ 23
    4.3  Estimated "As Is" Valuation of the Debtor's Property ................ 24
    4.4  Secured Claims Asserted Against the Estate .......................... 25
    4.5  Events Precipitating the Chapter 11 Filing .......................... 27
    4.6  The Debtor's Plan Financial Projections for the Debtor's Reorganization .... 28

V.  SIGNIFICANT EVENTS IN THE DEBTOR'S CHAPTER 11 CASE ..................... 29
    5.1  Debtor's Operation as Debtor-In-Possession .......................... 29
    5.2  Debtor in Possession Financing ...................................... 29
    5.3  Debtor's Motion to Exercise Option Agreements ....................... 30
    5.4  Debtor's Employment of Professionals ................................ 30
    5.5  Setting of the Bar Date ............................................. 31
    5.6  Subordination of Rescission Claimants; Claims ....................... 31

VI.  TREATMENT OF UNCLASSIFIED CLAIMS ...................................... 31
    6.1  Treatment of Allowed Administrative Claims .......................... 32
    6.2  Treatment of Tax Claims ............................................. 34

VII.  CLASSIFICATION OF CLAIMS AND INTERESTS ............................... 35

VIII.  THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ............ 36
    8.1  Class 1:  Allowed Secured Claims of Governmental Units .............. 36
    8.2  Classes 2.1-2.2:  Allowed Secured Claims of Steiner ................. 37
    8.3  Class 3:  Allowed Secured Claims of Mechanics Lien Creditors ........ 38
    8.4   Class 4:  Allowed Priority Unsecured Claims ........................ 38
    8.5  Class 5:  Allowed General Unsecured Claims .......................... 39
    8.6  Class 6:  Allowed Subordinated Rescission Claims .................... 39
    8.7  The Plan's Treatment of Holders of Allowed Interests (Class 7) ...... 40

IX.  ACCEPTANCE OR REJECTION OF THE PLAN ................................... 40
    9.1  Introduction ........................................................ 40
    9.2  Who May Object to Confirmation of the Plan .......................... 41
    9.3  Who May Vote to Accept/Reject the Plan .............................. 41
    9.4  What is an Allowed Claim/Interest ................................... 41
    9.5  What is an Impaired Class ........................................... 41
    9.6  Who is Not Entitled to Vote ......................................... 41
    9.7  Who can Vote in More than One Class ................................. 42

i

Amended Disclosure Statement

| | 9.8 | Votes Necessary for a Class to Accept the Plan | 42 |
| | 9.9 | Treatment of Nonaccepting Class(es) | 42 |
| | 9.10 | Request for Confirmation Despite Nonacceptance by Impaired Class(es) | 43 |
| X. | | MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN | 43 |
| | 10.1 | Introduction | 43 |
| | 10.2 | Source of Funds | 43 |
| | 10.3 | Management of the Debtor and Retention of Professionals After Effective Date | 44 |
| | 10.4 | Implementation of Plan | 45 |
| | 10.5 | Representative of the Estate | 45 |
| | 10.6 | Avoidance Actions | 46 |
| | 10.7 | Collection of Avoidance Actions Recoveries | 46 |
| XI. | | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 46 |
| | 11.1 | Executory Contracts Potentially Being Assumed | 46 |
| | 11.2 | Executory Contracts Being Rejected | 46 |
| | 11.3 | Bar Date for Rejection Damages | 46 |
| | 11.4 | Changes in Rates Subject to Regulatory Commission Approval | 47 |
| XII. | | BEST INTEREST OF CREDITORS TEST AND PLAN FEASIBILITY | 47 |
| | 12.1 | Best Interest of Creditors Test | 47 |
| | 12.2 | Feasibility | 47 |
| XIII. | | LIMITATION OF LIABILITY | 48 |
| | 13.1 | No Liability for Solicitation or Participation | 48 |
| | 13.2 | Limitation of Liability | 48 |
| XIV. | | CONDITIONS TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN | 49 |
| | 14.1 | Conditions Precedent to Plan Confirmation | 49 |
| | 14.2 | Conditions Precedent to Plan Effectiveness | 49 |
| | 14.3 | Waiver of Conditions | 49 |
| XV. | | RETENTION OF JURISDICTION | 50 |
| XVI. | | MODIFICATION OR WITHDRAWAL OF PLAN | 50 |
| | 16.1 | Modification of Plan | 50 |
| | 16.2 | Nonconsensual Confirmation | 50 |
| XVII. | | TAX CONSEQUENCES OF PLAN | 50 |
| | 17.1 | Introduction | 50 |
| | 17.2 | Federal Income Tax Consequences to the Debtor | 51 |
| | 17.3 | Tax Consequences to Creditors | 52 |
| XVIII. | | MISCELLANEOUS | 53 |
| | 18.1 | Discharge of Debtor and Injunction | 53 |
| | 18.2 | Headings | 53 |
| | 18.3 | Notices | 53 |
| | 18.4 | Inconsistencies | 54 |

ii

# I.

## __INTRODUCTION__

The purpose of a disclosure statement is to provide information to enable a typical creditor to make an informed judgment about a plan of reorganization and to enable such creditor to determine whether it is in its best interest to vote for (accept) or against (reject) such plan. The Bankruptcy Court has already approved a disclosure statement [Docket no. _] in this case. The Debtor now seeks approval of its Plan. This Disclosure Statement is in support of the Debtor's Plan.

Included on the CD containing this Disclosure Statement is a copy of the Debtor's Plan [FOR PURPOSES OF OBTAINING APPROVAL OF THIS DISCLOSURE STATEMENT, ATTACHED AS **EXHIBIT 4** IS A COPY OF THE PLAN – THIS PARENTHETICAL WILL NOT BE INCLUDED IN THE DISCLOSURE STATEMENT SERVED ON PARTIES AS THEY WILL BE GETTING A COPY OF THE PLAN AS PART OF THE MAILING].

THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE ENCLOSED PLAN. The Disclosure Statement summarizes the contents of the Plan, certain information relating to the Plan and the process the Bankruptcy Court follows in determining whether to confirm the Plan.

The Bankruptcy Code requires a Disclosure Statement to contain "adequate information" concerning the Plan. On _____, 2018, the Bankruptcy Court entered an order approving this Disclosure Statement, based upon a finding that this document contained "adequate information" to enable parties affected by the Plan to make an informed judgment regarding the Plan.

The Debtor's Plan provides for three classes of secured claims; one class of Priority Claims; one class of General Unsecured Claims; one class of subordinated claims; and one class of Interest Holders. The Effective Date of the Plan is the tenth Business Day of the first full month after entry of the Confirmation Order.

Creditors holding Allowed Secured Claims will receive Distributions, which the Debtor has valued at 100 cents on the dollar plus interest, on the Distribution Date or over a period of

2

time as described below. The Class of Allowed Priority Claims will receive Distributions, which the Debtor has valued at 100 cents on the dollar, on the initial Distribution Date. The Class of Allowed General Unsecured Claims will receive Distributions, which the Debtor has valued at 100 cents on the dollar, on the Distribution Date. The Class of Rescission Claims will receive Distributions based on the results of the Subordination Litigation. Interest Holders will retain their interest. All Creditors and equity Interest Holders should refer to Article V of the Plan for information regarding the precise treatment of their Claims and Interests.

The Debtor's Plan provides for the structured reorganization of the Debtor. The Debtor shall make all payments due under the Plan to holders of Allowed Claims and Allowed Interests from the Net Financing Proceeds, Net Cash flow, Net Sales Proceeds, and the prosecution and liquidation of the Debtor's Avoidance Actions, if any.

READ THE DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:

- ➢ **WHO CAN VOTE OR OBJECT TO THE PLAN;**
- ➢ **HOW YOUR CLAIM IS TREATED;**
- ➢ **HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION;**
- ➢ **A BRIEF HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING ITS CHAPTER 11 BANKRUPTCY PROCEEDING;**
- ➢ **WHAT FACTORS THE BANKRUPTCY COURT WILL CONSIDER TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN;**
- ➢ **WHAT IS THE EFFECT OF CONFIRMATION; AND**
- ➢ **WHETHER THE PLAN IS FEASIBLE.**

The Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own attorney to obtain more specific advice on how the Plan will affect you and your best course of action.

Be sure to read the Plan as well as the Disclosure Statement. If there are any inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern.

3

XS Kogler Disclosure Statement

**II.**

**DEFINITIONS AND RULES OF INTERPRETATION**

**2.1** **Definitions.** The following defined terms are used in the Plan. Any capitalized term that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules.

2.1.1 <u>Additional Purchased Property</u> means that certain 295 additional acres located in Bastrop County, Texas, adjacent to the First Purchased Property and Second Purchased Property, purchased by the Debtor from 2008 – 2012 and currently owned by the Debtor.

2.1.2 <u>Administrative Claim(s)</u> means any Claim incurred after the Petition Date but before the Confirmation Date for any cost or expense of administration of the Case allowable under Section 330, 331, 503(b), or 507(a)(1) of the Bankruptcy Code, including, without limitation, any actual and necessary post-petition expenses of preserving the Estate of the Debtor, any actual and necessary post-petition expenses of operating the business of the Debtor, all compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under Section 330, 331, or 503 of the Bankruptcy Code and any fees or charges assessed against the Estate of the Debtor under Section 1930 of title 28 of the United States Code.

2.1.3 <u>Administrative Claims Bar Date</u> means the last date fixed by the Plan for the filing of Proofs of Claim or requests for payment of Administrative Claims. Under the Plan, the Administrative Claims Bar Date shall be the first Business Day after the sixtieth (60th) day after the Confirmation Date.

2.1.4 <u>Affiliate(s)</u> means the term shall have the meaning set forth under Section 101(2) of the Bankruptcy Code, including, but not limited to, as to any Person, any other Person that directly or indirectly owns or controls, is owned or controlled by, or is under common ownership or control with, such Person. The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of the power to direct or

4

cause the direction of the management and policies of such Person, whether through the

ownership of voting securities or other equity ownership interest, by contract or otherwise.

    2.1.5    Allowed means Claim(s) or Interest(s), such Claim(s) or Interest(s), to the extent that it or they are "Allowed Claim(s)" or "Allowed Interest(s)."

    2.1.6    Allowed Amount means:

        (i)    With respect to any Administrative Claim (i) if the Claim is based upon a Fee Application, the amount of such Fee Application that has been approved by a Final Order of the Bankruptcy Court; (ii) if the Claim is based upon any indebtedness or obligation incurred in the ordinary course of business of the Debtor and is not otherwise subject to an Administrative Claim Bar Date, the amount of such Claim that has been agreed to by the Debtor and such creditor, failing which, the amount thereof as fixed by a Final Order of the Bankruptcy Court; or (iii) if the Holder of such Claim was required to file and has filed proof thereof with the Bankruptcy Court prior to an Administrative Claim Bar Date, (1) the amount stated in such proof if no objection to such Proof of Claim is interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or (2) the amount thereof as fixed by Final Order of the Bankruptcy Court if an objection to such proof was interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court. The Allowed Amount of any Administrative Claim which is subject to an Administrative Claims Bar Date and not filed by the applicable Administrative Claims Bar Date shall be zero, and no Distribution shall be made on account of any such Administrative Claim;

        (ii)    With respect to any Claim which is not an Administrative Claim (the "Other Claim"): (i) if the Holder of such Other Claim did not file proof thereof with the Bankruptcy Court on or before the Claims Bar Date, the amount of such Claim as listed in the Debtor's Schedules as neither disputed, contingent or unliquidated; or (ii) if the Holder of such Claim has filed proof thereof with the

Case: 16-31367    Doc# 315    Filed: 12/22/17    Entered: 12/22/17 18:31:13    Page 7 of 56

XS Ranch Disclosure Statement

Bankruptcy Court on or before the Claims Bar Date, (a) the amount stated in such proof if no objection to such Proof of Claim was interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or the Bankruptcy Court, or (b) the amount thereof as fixed by Final Order of the Bankruptcy Court if an objection to such proof was interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or the Bankruptcy Court. The Allowed Amount of any Other Claim which is not Filed by the applicable Claims Bar Date, is not listed on the Debtor's Schedules or is listed as disputed, unliquidated, contingent or unknown, and is not allowed under the terms of the Plan shall be zero, and no Distribution shall be made on account of any such Claim; and

(iii) With respect to any Interest, (i) the amount provided by or established in the records of the Debtor at the Confirmation Date, provided, however, that a timely filed proof of Interest shall supersede any listing of such Interest on the records of the Debtor; or (ii) the amount stated in a proof of Interest Filed prior to the Confirmation Date if no objection to such Interest was filed prior to the Confirmation Date or such later date as the Bankruptcy Court allows; or (iii) the amount of such Interest as fixed by a Final Order of the Bankruptcy Court.

2.1.7 <u>Allowed Claim(s)</u> means except as otherwise provided in the Plan (including with respect to those Classes for which the amount of the Allowed Claims is specified by the Plan), a Claim to the extent of the Allowed Amount of such Claim.

2.1.8 <u>Allowed Interest(s)</u> means any Interest to the extent, and only to the extent, of the Allowed Amount of such Interest.

2.1.9 <u>Allowed Secured Claim</u> means an Allowed Claim secured by a valid and unavoidable Lien against property in which an Estate has an interest, or which is subject to setoff under Section 553 of the Bankruptcy Code, to the extent of the value, determined in accordance with Section 506(a) of the Bankruptcy Code, of the interest of the holder of

6

such Allowed Claim in the Estate's interest in such property, or to the extent of the amount subject to any setoff, as the case may be.

2.1.10 _Asset(s)_ means any assets that are property of the Debtor pursuant to Section 541 of the Bankruptcy Code, including but not limited to the Property.

2.1.11 _Available Cash_ means the Cash deposited into the Distribution Account(s) on or after the Effective Date that is available for making Distributions under the Plan to Holders of Allowed Claims.

2.1.12 _Avoidance Actions_ means any action or proceeding filed pursuant to the provisions of Sections 506, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, or 551 of the Bankruptcy Code, or any similar action or proceeding filed to recover property for or on behalf of the Estate or to avoid a Lien or transfer.

2.1.13 _Avoidance Actions Recoveries_ means any Cash or other property received by the Debtor from all or any portion of an Avoidance Action(s), including, but not limited to, awards of damages, attorneys' fees and expenses, interest and punitive damages, whether recovered by way of settlement, execution on judgment or otherwise.

2.1.14 _Bankruptcy Code_ means the Title 11 of the United States Code, 11 U.S.C. §§ 101 _et seq._, as applicable to the Case.

2.1.15 _Bankruptcy Court_ means the United States Bankruptcy Court for the Northern District of California, having jurisdiction over the Case and, to the extent of any withdrawal of the reference made pursuant to Section 157 of title 28 of the United States Code, the United States District Court for the Norther District of California; or, in the event such courts cease to exercise jurisdiction over the Case, such court or unit thereof that exercises jurisdiction over the Case in lieu thereof.

2.1.16 _Bankruptcy Rules_ means collectively, as now in effect or hereafter amended and as applicable to the Case, (i) the Federal Rules of Bankruptcy Procedure, and (ii) the Local Bankruptcy Rules and General Orders applicable to cases pending before the Bankruptcy Court.

7

XS Right Disclosure Statement

2.1.17   <u>Business Day</u> means any day, other than a Saturday, a Sunday or a "legal holiday," as defined in Bankruptcy Rule 9006(a).

2.1.18   <u>Capital Investment</u> means the total monies invested in the Debtor by members of Class 6 and 7, which equals $54,275,000.

2.1.19   <u>Capital Pro Rata</u> means the proportionate share of an Allowed Claim or Interest held by a member of Class 6 or 7, respectively, relative to the total Capital Investment.  The Capital Pro Rata formula is calculated as follows:

$$\frac{\text{Allowed Claim or Interest of a member of Class 6 or Class 7}}{\text{Total Capital Investment}}$$

2.1.20   <u>Case</u> means the Chapter 11 case of the Debtor pending before the Bankruptcy Court.

2.1.21   <u>Cash</u> means currency of the United States of America and cash equivalents, including, but not limited to, bank deposits, immediately available or cleared checks, drafts, wire transfers and other similar forms of payment.

2.1.22   <u>Causes of Action</u> means any and all claims, demands, rights, actions, causes of action and suits of the Debtor or the Estate, of any kind or character whatsoever, known or unknown, suspected or unsuspected, whether arising prior to, on or after the Petition Date, in contract or in tort, at law or in equity or under any other theory of law, that the Debtor or the Debtor's Estate has or asserts, or may have or assert, against third parties, whether or not brought as of the Effective Date, and which have not been settled or otherwise resolved by Final Order as of the Effective Date, including but not limited to (a) rights of setoff, counterclaim or recoupment, (b) claims on contracts or for breaches of duties imposed by law, (c) rights to object to Claims or Interests, (d) such claims and defenses as fraud, mistake, duress or usury, (e) Avoidance Actions, (f) claims for tax refunds, (g) claims to recover accounts receivable, and (h) any other claims which may be asserted against third parties.

2.1.23   <u>City</u> means the City of Bastrop, Texas.

8

2.1.24    Claim(s) means this term shall have the broadest possible meaning under Section 101(5) of the Bankruptcy Code, and shall include (a) any right to payment from the Debtor, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

2.1.25    Claims Bar Date means for any Claim other than an Administrative Claim, October 23, 2017, established by the Bankruptcy Court as the last date for Creditors to file Proof of Claims with the Bankruptcy Court in the Debtor's case.  The exceptions to this Claims Bar Date are: (1) Claims arising from the rejection of executory contracts or unexpired leases; (2) Claims of "governmental units," as such term is defined in Section 101(27) of the Bankruptcy Code; and (3) Claims arising as the result of transfer avoidance pursuant to Chapter 5 of the Bankruptcy Code.  For Claims arising from rejection of executory contracts or unexpired leases pursuant to 11 U.S.C. § 365, the last day to file a Proof of Claim is (a) 30 days after the date of entry of the order authorizing the rejection, or (b) 30 days after service of a bar date notice upon the Creditor asserting such Claim, whichever is later.  For Claims of "governmental units," as that term is defined in 11 U.S.C. §101(27), Proofs of Claim are timely filed if filed: (a) before 180 days after the Petition Date, or as otherwise provided in Rule 3002(c)(1) of the Bankruptcy Rules. *See* 11 U.S.C. §502(b)(9).  For Claims arising from the avoidance of a transfer under chapter 5 of the Bankruptcy Code, the last day to file a Proof of Claim is 30 days after the entry of judgment avoiding the transfer, or (b) 30 days after service of a bar date notice upon the Creditor asserting such Claim, whichever is later.

2.1.26    Class means each group of Claims or Interests classified in the Plan pursuant to Sections 1122 and 1123 of the Bankruptcy Code.

2.1.27    Committee, means the Official Committee of Creditors Holding General Unsecured Claims appointed in this Case by the U.S. Trustee

2.1.28    Confirmation Date means the date on which the Confirmation Order is entered on the Bankruptcy Court's docket.

2.1.29    Confirmation Order means the Final Order entered by the Bankruptcy Court confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

2.1.30    County means the Treasurer and Tax Collector of the County of Bastrop, Texas.

2.1.31    Creditor(s) means any Person who is the Holder of a Claim against the Debtor that arose or accrued or is deemed to have arisen or accrued or to have matured, or otherwise become due, owing, and payable on or before the Petition Date, including, without limitation, Claims of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code.

2.1.32    Crestline means Crestline Direct Finance, L.P. or one of its affiliates as it may designate, as sole lead arranger, on behalf of investments funds managed by Crestline Management, L.P.

2.1.33    Confirmation Order means the Final Order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code.

2.1.34    Debt Discharge Amount means any amount of potential discharged indebtedness for federal income tax purposes.

2.1.35    Debtor means XS Ranch Fund, VI, L.P., a Delaware limited partnership. For the purpose of this Plan, reference to "Debtor" shall include the Reorganized Debtor.

2.1.36    Default Notice means written notice by any member of a Class who asserts a default under the Plan, which must be made to the Notice Parties via e-mail and certified U.S. Mail.

2.1.37    DIP Financing means debtor in possession financing.

Case: 16-31367    Doc# 315    Filed: 12/22/17    Entered: 12/22/17 18:31:13    Page 12 of 56

XS Ranch Disclosure Statement

2.1.38    Disclosure Statement means the Debtor's Disclosure Statement in Support of the Debtor's Amended Chapter 11 Plan of Reorganization, as such may be further amended or modified.

2.1.39    Disputed Claim(s) means all or any part of a Claim other than any Allowed Amount thereof as to which any one of the following applies: (i) no Proof of Claim has been filed with respect to such Claim, and either (a) the Claim is not listed in the Schedules; or (b) the Claim is listed in the Schedules as unliquidated, disputed, contingent, unknown or in a zero amount, (ii) the Claim is the subject (a) to an Avoidance Action; (b) of offset by an Avoidance Action; (c) to a timely objection that has not been resolved by a Final Order; or (d) to a request for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules, any applicable order of the Bankruptcy Court, or the Plan which is Filed on or before the Claims Objection Deadline, which adversary proceeding, objection, or request for estimation has not been dismissed, withdrawn or determined by a Final Order; or (iii) the Claim is otherwise treated as a "Disputed Claim" pursuant to the Plan.

2.1.40    Disputed Lien(s) means an asserted lien(s) against Assets of the Debtor that is either subject to a Disputed Claim, not duly perfected, subject to an Avoidance Action, or subject to an action pursuant to Bankruptcy Code Sections 510(c)(2) and/or 506(d).

2.1.41    Distribution(s) means payments to Holders of Allowed Claims and Interests provided for under the Plan.

2.1.42    Distribution Account(s) means account(s) to be established for the Property by the Debtor or the Plan Agent at a bank into which the Debtor's Available Cash shall be deposited.

2.1.43    Distribution Date means with respect to any Allowed Claim or Allowed Interest, the date on which a Distribution is required to be made under the Plan.

2.1.44    Effective Date means the tenth Business Day of the first full month after the fourteenth day after entry of an order confirming the Plan.

11

2.1.45     Estate means the bankruptcy estate of the Debtor created pursuant to Section 541 of the Bankruptcy Code.

2.1.46     Event of Default means the Debtor's failure to cure within the Grace Period a payment required to be made under the Plan pursuant to the terms herein.

2.1.47     Exit Financing means the $30 million of exit financing agreed to be provided by Crestline upon confirmation of the Plan, as described in and pursuant to the Commitment Letter dated December 15, 2017 attached as **Exhibit 3** to the Plan.

2.1.48     Fee Application(s) means applications of Professional Persons under Sections 330, 331 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of expenses in the Case.

2.1.49     Filed means delivered to, received by and entered upon the legal docket by the Clerk of the Bankruptcy Court.  "File" shall have a correlative meaning.

2.1.50     Final Order means an order or judgment of the Bankruptcy Court or other applicable court, as entered on the applicable docket, that has not been reversed, stayed, modified or amended, and as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or to obtain a rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue, or obtain a rehearing shall have been waived in writing in form and substance satisfactory to the Debtor or, in the event that an appeal, writ of certiorari, or proceeding for reargument or rehearing of such order or judgment has been sought, such order or judgment shall have been affirmed by the highest court to which such order or judgment was appealed, or certiorari has been denied, or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired.

2.1.51     Financial Projections means the financial projections for the Plan prepared by the management of the Debtor based on two scenarios - where the claims of the Rescission Claimants are: (i) subordinated below Equity Interest holders, and (ii) treated

pari passu with Equity Interest Holders, which are attached hereto as **Exhibit 1A and 1B**, respectively.

2.1.52    First Purchased Property means that certain 6,836.838 acres of real property located in Bastrop County, Texas, purchased by the Debtor from Steiner.

2.1.53    General Unsecured Claim(s) means a Claim against the Debtor that is not (a) a Secured Claim, (b) an Administrative Claim, (c) a Tax Claim, (d) a Priority Claim, or (e) a Subordinated Claim.

2.1.54    Grace Period means fifteen (15) Business days.

2.1.55    Gross Rental Income means all rents, issues and profits generated by the Property.

2.1.56    Groundwater Agreement means that certain Ground Water Rights Purchase Agreement dated May 14, 2014, whereby the City purchased among other things, 3,000 acre feet of water rights.

2.1.57    Holder means the beneficial owner of any Claim or Interest.

2.1.58    Interest(s) means any equity security interest in the Debtor within the meaning, of Section 101(16) of the Bankruptcy Code, including, without limitation, any equity ownership interest in the Debtor, whether in the form of common or preferred stock, stock options, warrants, partnership interests, or membership interests.

2.1.59    Lien means any lien, encumbrance, pledge or other charge against property.

2.1.60    Mechanics Lien Creditor(s) means those creditor(s) who hold an Allowed Secured Claim against the Property based on a valid, non-avoidable mechanics lien.

2.1.61    Net Cash Flow means the Gross Rental Income less Operating Costs.

2.1.62    Net Financing Proceeds means the proceeds generated from debt or equity capital.

2.1.63    Net Sales Proceeds means the Cash generated from the sale(s), liquidation or transfer of the Assets, including the Property, less payment of selling expenses, closing costs, taxes, and any associated Post-Confirmation Expenses pursuant to the Financial

13

Projections and Administrative Claims incurred in furtherance of such sales or liquidation of such Assets.

2.1.64    Notice Parties means the Debtor, Debtor's counsel (Winthrop Couchot Golubow Hollander, LLP), the Committee, Committee counsel (Sheppard, Mullin, Richter & Hampton, LLP), and the Plan Agent.

2.1.65    Operating Costs means those costs and expenses reasonably necessary to operate, maintain, and manage the Property including a reserve for the payment of real property taxes for the current tax period.

2.1.66    Option Agreement(s) means the Repurchase Option Agreements entered into between the Debtor and Steiner and S&S on July 12, 2016, September 29, 2016, and October 27, 2016, respectively, to repurchase from Steiner and S&S 758.028, 507.061 and 1,164.571 acres of the Property, respectively.

2.1.67    Order for Relief means June 1, 2017.

2.1.68    Orderly Liquidation means an orderly liquidation of all of the Debtor's assets to be conducted in the event of the Debtor's inability to timely raise the Post-Closing Equity, which process is described herein.

2.1.69    Partnership Agreement means that certain Agreement of Limited Partnership of XS Ranch Fund VI, L.P., a Delaware limited partnership.

2.1.70    Person means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority, governmental unit, committee or other entity of whatever nature.

2.1.71    Petition Date means December 23, 2016.

2.1.72    Petitioning Creditors means Peter Mainstain, Dr. Hasso Plattner and Granite Land Company, Inc., and subsequently joined by Jackie Yellin, Trustee of the Gary S. Kading Irrevocable Trust.

2.1.73    Phase I Property means that certain 1,938.421 acres of real property from the First Purchased Property collateral.

14

2.1.74    Plan means the Debtor's Amended Chapter 11 Plan of Reorganization, including, without limitation, all exhibits, supplements, appendices, and schedules hereto, either in its present form or as it may be altered, amended, or modified from time to time.

2.1.75    Plan Agent means the Person that is responsible to administer the Plan and to make Distributions under the Plan, which is expected to be Michael VanderLey of Force 10, or such other Person as may be selected by the Debtor.

2.1.76    Plan Proponent means the Debtor, which is the party-in-interest that is proposing the Plan.

2.1.77    Post-Closing Equity means $10 million of equity capital that must be raised by the Debtor post-confirmation pursuant to the terms of Exit Financing to be provided by Crestline.

2.1.78    Post-Confirmation Expense(s) means the fees and expenses incurred by the Debtor and its professionals following the Confirmation Date (including the fees and costs of Professionals) for the purpose of (i) prosecuting and liquidating the Avoidance Actions; (ii) objecting to and resolving Disputed Claims and Disputed Liens; (iii) selling or otherwise liquidating the Assets; (iv) effectuating Distributions under the Plan; and (v) otherwise consummating the Plan and closing the Debtor's Chapter 11 Case.

2.1.79    Priority Claim(s) means any Claim, other than an Administrative Claim or a Tax Claim, to the extent entitled to priority under Section 507(a) of the Bankruptcy Code.

2.1.80    Pro Rata means the proportionate share of an Allowed Claim or Interest held by a member of Class 6 or 7, respectively, relative to the total Allowed Claims or Interests held by members of Classes 6 or 7, respectively.  The Pro Rata formula is calculated as follows:

| **Pro Rata For Class 6**: | **Pro Rata For Class 7**: |
|---|---|
| Allowed Claim of a member of Class 6 | Allowed Claim of a member of Class 7 |
| Total Allowed Claims of all members of Class 6 | Total Allowed Claims of all members of Class 7 |

15

2.1.81    Professional means a Person (a) employed by the Debtor pursuant to a Final Order in accordance with Sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to Sections 327, 328, 329, 330 and 331 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Section 503(b) of the Bankruptcy Code.

2.1.82    Professional Fees means all Allowed Claims for compensation and for reimbursement of expenses under Sections 328, 330 and/or 503(b) of the Bankruptcy Code.

2.1.83    Property means the First Purchased Property, Second Purchased and Additional Purchased Property, which collectively constitutes 8,740 acres of real property located in Bastrop, Texas.

2.1.84    Reorganized Debtor means the Debtor, as reorganized under the terms of this Plan on and after the Effective Date, and any successors thereto by merger, consolidation, acquisition, or otherwise.

2.1.85    Rescission Claimants means the Petitioning Creditors and other limited partners who filed a Demand for Arbitration with JAMS, entitled Dr. Hasso Plattner, et al. v. XS Ranch Fund VI, L.P., et al., JAMS Ref. No. 1120012347 and entered into the Rescission Claimants Settlement.

2.1.86    Rescission Claimants Settlement means that certain Agreement of Settlement and Mutual General Release, which inter alia provided for a stipulation for entry of arbitration award and the rescission of limited partners' purchase of the limited partnership interests and restitution for their capital contributions in the collective amount of $28,575,001.

2.1.87    Schedules means the schedules of assets and liabilities and list of equity security holders Filed by the Debtor, as required by Section 521 of the Bankruptcy Code, Bankruptcy Rules 1007(a)(3) and (b)(1), and Official Bankruptcy Form No. 6, as amended from time to time.

16

2.1.88    Second Purchased Property means that certain 1,922.597 acres of real property located in Bastrop County, Texas, purchased by the Debtor from Steiner.

2.1.89    Secured Claim(s) means any Claim, including interest, fees, costs, and charges to the extent allowable pursuant to Bankruptcy Code Section 506, which is secured by a valid and unavoidable lien on the Debtor's Assets.

2.1.90    Secured Real Property Tax Claim(s) means the claim(s) held by the County secured by liens on the Property owned by the Debtor.

2.1.91    S&S means S&S Investments, LLC, an affiliate of Steiner.

2.1.92    Steiner means Steiner & Sons, Ltd.

2.1.93    Steiner 1st Claim means the Allowed Claim of Steiner based on Steiner's rights arising from the Steiner 1st Loan.

2.1.94    Steiner 1st Loan means that certain seller carryback loan made by Steiner in the amount of $10,000,000, as part of the purchase price paid by the Debtor to Steiner for the First Purchased Property, as evidenced by the promissory notes and Deed of Security Agreement and Financing Statement entered into on December 19, 2006.

2.1.95    Steiner 2nd Claim means the Allowed Claim of Steiner based on Steiner's rights arising from the Steiner 2nd Loan.

2.1.96    Steiner 2nd Loan means that certain loan made by Steiner in the amount of $1,500,000, as evidenced by the promissory notes and Deed of Security Agreement and Financing Statement entered into on September 6, 2013.

2.1.97    Steiner 3rd Loan means that certain loan made by Steiner in the amounts of $5,000,000, as evidenced by the promissory notes and Deed of Security Agreement and Financing Statement entered into on March 20, 2015.

2.1.98    Steiner 4th Loan means that certain loan made by Steiner in the amounts of $1,000,000, as evidenced by the promissory notes and Deed of Security Agreement and Financing Statement entered into on August 6, 2015.

17

2.1.99    Steiner 5th Loan means that certain loan made by Steiner in the amounts of $2,000,000, as evidenced by the promissory notes and Deed of Security Agreement and Financing Statement entered into on December 18, 2015.

2.1.100   Steiner Loans means, collectively, the Steiner 1st Loan, Steiner 2nd Loan, Steiner 3rd Loan, Steiner 4th Loan, and Steiner 5th Loan.

2.1.101   Steiner Loan Documents means the promissory notes dated December 19, 2006 and September 6, 2013, and all security agreements, loan modifications, and all other loan documents related thereto.

2.1.102   Steiner Maturity Date means the respective maturity date provided for in each of the respective Steiner Loan Documents, as set forth below:

| Loan | Maturity Date |
| --- | --- |
| Steiner 1st Loan | June 19, 2023 |
| Steiner 2nd Loan | June 19, 2023 |

2.1.103   Steiner New Maturity Date means the first Business Day following the one year anniversary of the Steiner Maturity Date.

2.1.104   Subordination Litigation means the Estate's efforts through adversary, motion, or otherwise, to subordinate, pursuant to Section 510 of the Bankruptcy Code, the Claim(s) held by the Rescission Claimants.

2.1.105   Tax means Any tax, charge, fee, levy, impost or other assessment by any federal, state, local or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem, estimated, severance, stamp, occupation and withholding tax.  "Tax" shall include any interest or additions attributable to, or imposed on or with respect to such assessments.

2.1.106   Tax Claim(s) means any Claim for any Tax to the extent that it is entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code.

2.1.107   Transferred Property means the 2,430 acres of the Property transferred to Steiner and S&S pursuant to three Purchase Agreements.

18

2.1.108  <u>XS Water</u> means XS Water Company, LLC, a Texas limited liability company and wholly owned subsidiary of the Debtor.

**2.2**     <u>**Rules of Construction.**</u>  For purposes of the Plan and the Disclosure Statement, unless otherwise provided herein or in the Plan, (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) each pronoun stated in the masculine, feminine or neuter includes the masculine, feminine and neuter; (c) any reference in the Plan or the Disclosure Statement to an existing document or schedule Filed or to be Filed means such document or schedule, as it may have been or may be amended, modified or supplemented; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (e) except as otherwise indicated herein all references in the Plan or the Disclosure Statement to Sections and Articles are references to Sections and Articles of or to the Plan; (f) the words "therein," "thereunder" and "thereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; and (g) unless otherwise provided in the Plan or the Disclosure Statement, any reference in the Plan or the Disclosure Statement to a contract, instrument, release, indenture, agreement, or other document being in a particular form or on particular terms and conditions means that such document shall be substantially and materially in such form or substantially and materially on such terms and conditions; and (h) the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent with the express terms of the Plan or the Disclosure Statement or any other provision in this Section.

**III.**

**<u>PLAN CONFIRMATION DEADLINES</u>**

The Bankruptcy Court has not confirmed the Plan described in this Disclosure Statement. Accordingly, the terms of the Plan are not binding on anyone.  However, if the Bankruptcy Court confirms the Plan, then the Plan will be binding on the Debtor and on all Creditors and Interest Holders in this Case.

3.1     **Time and Place of the Confirmation Hearing.**  The hearing where the Bankruptcy Court will determine whether or not to confirm the Plan will take place at 1300 Clay Street, 2nd Floor, Oakland, California on _____ at _____ a.m. in Courtroom 201.

3.2     **Deadline for Voting for or Against the Plan.**  If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot to:

> Winthrop Couchot Golubow Hollander, LLP
> Attn:  PJ Marksbury
> 660 Newport Center Drive, Suite 400
> Newport Beach, CA 92660
> Email:  pj@wcghlaw.com
> Facsimile:  (949) 720-4111

Your ballot must be **received by** _____, or it will not be counted.

3.3     **Deadline for Objecting to the Confirmation of the Plan.**  Objections to the confirmation of the Plan must be filed with the Bankruptcy Court, and served upon the following parties so that they are received by _____,

> **Counsel to the Debtor:**      Garrick A. Hollander, Esq.
> Winthrop Couchot Golubow Hollander, LLP
> 660 Newport Center Drive, Suite 400
> Newport Beach, CA 92660
> Email:  ghollander@wcghlaw.com;
> Facsimile:  (949) 720-4151

3.4     **Identity of Person to Contact for More Information Regarding the Plan.**  Any interested party desiring further information about the Plan should contact the Debtor's counsel, Garrick A. Hollander of Winthrop Couchot Golubow Hollander, LLP, via mail at 660 Newport Center Drive, Suite 400, Newport Beach, CA 92660, via telephone at (949) 720-4100, via facsimile at (949) 720-4151 or email at ghollander@wcghlaw.com.

3.5     **Disclaimer.**  The information contained in this Disclosure Statement is provided by the Debtor.  The Debtor represents that everything stated in this Disclosure Statement is true to the best of the Debtor's knowledge.  No statements or information concerning the Debtor or its Assets are authorized, other than those set forth herein.  The Bankruptcy Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

Case: 16-31367   Doc# 315   Filed: 12/22/17   Entered: 12/22/17 18:31:13   Page 22 of
56

The discussion in this Disclosure Statement regarding the Debtor may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue," or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The liquidation analyses, distribution projections, projections of financial results and other information are estimates only, and the timing, amount and value of actual distributions to Creditors may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates, or projections may or may not turn out to be accurate.

The Debtor and its counsel are presently unaware of any prospective Avoidance Actions. The Debtor or other parties-in-interest may seek to investigate, file and prosecute Avoidance Actions after the Confirmation Date or Effective Date of the Plan whether or not the Avoidance Actions are identified in this Disclosure Statement.

## IV.

## FACTUAL BACKGROUND OF THE DEBTOR

### 4.1    Description of the Debtor and Nature of Debtor's Business

In 2006, the Debtor purchased the First Purchased Property from Steiner. The Debtor paid $4,200 an acre, or $28.7 million for the First Purchased Property. On or about June 1, 2007, the Debtor purchased the Second Purchased Property from Bastrop Beck Investments, Ltd. The Debtor paid $4,200 an acre, or $8.1 million cash for the Second Purchased Property. In August 2011, the Debtor sold approximately 315 acres of the First Purchased Property, resulting in the First Purchased Property making up a total of 6,521 acres of real property. From 2008 through 2012, the Debtor consummated several transactions with various buyers and sellers for the purchase and sale of additional parcels of land in order to implement its planning and entitlement objectives for the project. The net effect of these transactions was to increase the Debtor's real

21

property ownership by approximately 295 additional acres, to a total of 8,740 acres of real property.

As referenced in the Partnership Agreement and the offering materials provided to prospective limited partners in connection therewith, the Debtor's goal from the outset of its formation was to entitle and "horizontally develop" (i.e., develop an infrastructure such as roads, a bridge, water, sewer, gas and electric utilities, and other off-site and on-site improvements) the First Purchased Property, Second Purchased Property and any additional property purchased so as to enable the Debtor to sell real property lots at the greatest possible price to developers for their development of a large residential community that would also contain commercial offerings. To that end, the Debtor spent significant money and time surveying and quantifying the land, negotiating for and obtaining entitlements, setting up public improvement district and municipal utility district financing mechanisms, negotiating land sale contracts with homebuilders, and otherwise completing the pre-development work necessary to start horizontal improvements and sell lots to builders.

The Debtor also owns a 100% interest in XS Water, which owns the water royalty rights with respect to the Property. The Debtor does not generate any income directly from these rights. The Debtor's subsidiary, XS Water, and the City entered into the Groundwater Agreement whereby the City purchased among other things, 3,000 acre feet of water rights. Pursuant to the Groundwater Agreement: (i) the City is entitled to purchase an additional 3,000 acre feet of water for the purchase price of $1,000,000 over five years with an annual payment of $200,000 per year commencing January 1, 2015; and (ii) XS Water is entitled to $200,000 per year in revenue for 5 years, upon satisfaction of certain terms set forth in the Groundwater Agreement. The City must notify XS Water of its decision as to whether it will exercise its option to purchase the additional water rights on or before 90 days after the City obtains a final, non-appealable order from the Lost Pines Groundwater Conservation District granting the initial permit. XS Water and the City have extended the initial permit date from June 30, 2016 to June 30, 2021.

XS Region Disclosure Statement

### 4.2 The Transferred Property

In order to avoid a foreclosure of the Debtor's Property based on the Debtor's inability to pay $1.75 million of interest due to Steiner, its senior secured creditor, the Debtor negotiated a transaction whereby it transferred 2,430 of its 8,740 acres of real property to Steiner and its Affiliate S&S, with rights to repurchase the Transferred Property pursuant to three repurchase option agreements.

#### 4.2.1 Purchase Agreements

In July, September, and October 2016, the Debtor transferred the Transferred Property to Steiner and S&S pursuant to three (3) purchase agreements in exchange for Steiner making a cash payment of $500,000 and accepting the Transferred Property in payment and satisfaction of the Debtor's interest obligation. The general terms of the purchase agreements are summarized as follows:

| Date of Purchase Agreement | Party to Agreement | Property Conveyed | Consideration |
|---|---|---|---|
| 7/8/16 | Steiner | 758.028 acres of the Property | $757,500 of interest satisfied |
| 9/29/16 | Steiner | 507.061 acres of the Property | $498,750 of interest satisfied |
| 10/27/16 | S&S | 1,164.571 acres of the Property | $500,000 cash plus $498,750 of interest satisfied |

#### 4.2.2 Option Agreements

The transfer of the Transferred Property was subject to three Option Agreements in favor of the Debtor, with a deadline to exercise each option by July 12, 2017 and repurchase the Transferred Property by August 12, 2017. Pursuant to Section 108 of the Bankruptcy Code, these deadlines were automatically extended to September 12, 2017, and October 12, respectively; and based on agreement by Steiner and S&S, the deadline to exercise the option under the Option Agreements was further extended to September 29, 2017, and the deadline to close on the purchase of any of the Transferred Property was

23

further extended to October 29, 2017. The Option Agreements provided the Debtor with the right, but not the obligation, to repurchase certain amounts of property for specific prices by certain dates, with escalating prices, as set forth below:

| Date of Option Agreement | Property for Purchase | Purchase Price | Price Escalation if not timely closed | Deposit |
|---|---|---|---|---|
| 7/12/16 | 758.028 acres of the Property | $1,350,000 if purchase closes by 8/12/16 | $50,000 per month | $100,000 |
| 9/29/16 | 507.061 acres of the Property | $950,000 if purchase closes by 10/29/16 | $25,000 per month | $100,000 |
| 10/27/16 | 1,164.571 acres of the Property | $1,728,750 if purchase closes by 11/29/16 | $25,000 per month | $100,000 |

### 4.2.3   Critical Value of the Transferred Property

A material portion of the Transferred Property sat in the middle of – effectively bisecting – the Debtor's Property. Accordingly, not repurchasing the Transferred Property would have negatively affected the marketability and value of the property owned by the Debtor. As outlined in the Debtor's pleadings seeking authority to exercise the repurchase options, the Debtor believed that the market value of the Transferred Property was approximately $30 million to $37 million[1]. To that end, the Debtor sought authority from the Court to exercise the Option Agreement [See Docket no. 186], and on September 15, 2017, the Court entered an order authorizing such exercise [See Docket no. 201].

### 4.3   Estimated "As is" Valuation of the Debtor's Property

Based on the most recently obtained appraisal of the Property, the current value of the Property, including the Transferred Property, is approximately $89 million. On December 14, 2017, the Debtor obtained an appraisal of the Property from Jimmy H. Jackson, MAI, of Integra Realty Resources. This Property appraisal concludes that the Property has an "as is" prospective (as of

---

[1] For details on which the Debtor's opinion is based, see ¶¶ 25-30 and 36 of the Declaration of Michael VanderLey in support of DIP Financing [docket no. 88].

24

Kraig Plan Disclosure Statement

March 15, 2018) market value of $89.2 million, or approximately $10,200 per acre, and a liquidation value of $62.5 million, or approximately $7,150 per acre. A true and correct copy of the appraisal of the Property is attached hereto as **Exhibit 3** and incorporated herein by this reference.

### 4.4 Secured Claims Asserted Against the Estate

There are three groups of creditors who assert secured claims against the Debtor's assets.

(1) <u>Steiner</u>: As part of the consideration for the First Purchased Property, on December 19, 2006, the Debtor executed a promissory note in the amount of $10,000,000 in favor of Steiner, which was secured by the First Purchased Property. In or about August 2011, the Debtor sold approximately 315 acres of the First Purchased Property, thereby reducing Steiner's collateral on this loan to 6,521 acres of real property.

On September 6, 2013, the Debtor borrowed from Steiner $1,500,000, and executed a Promissory Note and Deed of Trust and Security Agreement, which secured the loan by the First Purchased Property and Second Purchased Property.

On October 28, 2014, Steiner and the Debtor entered into a Partial Release of Lien and Deed of Trust and Security Agreement (effectively, swapping liens against certain property), pursuant to which Steiner released the Phase I Property from its First Purchased Property collateral, and the Debtor granted a replacement lien in favor of Steiner against the Second Purchased Property.

On March 20, 2015, the Debtor borrowed from Steiner an additional $5,000,000, and executed a Promissory Note and Deed of Trust and Security Agreement, which secured the loan by Phase I Property. On August 6, 2015, the Debtor borrowed from Steiner an additional $1,000,000, and executed a Promissory Note and Deed of Trust and Security Agreement, which secured the loan by Phase I Property. On December 18, 2015, Debtor borrowed from Steiner an additional $2,000,000, and executed a Promissory Note and Deed of Trust and Security Agreement, which secured the loan by Phase I Property and the Additional Purchased Property.

As of the Petition Date, the Debtor owed Steiner the aggregate principal amount of $19.5 million plus accrued interest, which was secured by various tracts of the Property, as follows:

| Date of Promissory Note | Principal Amount | Collateral |
|---|---|---|
| December 19, 2006 | $10,000,000 | First Purchased Property (6,506 acres of the Property) |
| September 6, 2013 | 1,500,000 | First Purchased Property; Second Purchased Property (i.e., 8,444 acres of the Property) |
| March 20, 2015 | 5,000,000 | Phase I Property (i.e., 1,938 acres of the Property) |
| August 6, 2015 | 1,000,000 | Phase I Property (i.e., 1,938 acres of the Property) |
| December 18, 2015 | 2,000,000 | Phase I Property; Additional Purchased Property (i.e., 2,234 acres of the Property) |

The Steiner Loans provide for non-default interest of between 9% and 12% and "post-maturity" interest at 18% per annum. On September 27, 2017, with the use of DIP Financing proceeds, the Debtor paid off the Steiner 3rd Loan, Steiner 4th Loan, and Steiner 5th Loan, including a principal balance of $8.0 million plus interest and fees due on account of such loans. The Debtor remains current on its quarterly interest obligations to Steiner by virtue of the DIP Financing proceeds.

(2) <u>Rescission Claimants' Lien</u>. December 16, 2016, the Rescission Claimants recorded an abstract of judgment against the Property. This lien might be avoided as a preference or transferred back to the estate under Section 510(c). In any event, the Debtor expects the claim to be subordinated below all Allowed Claims and Interests pursuant to Section 510(b), as further discussed herein. On October 10, 2017, the Debtor filed against the Rescission Claimants a complaint pursuant to Section 510(b) for subordination of the claims held by the Rescission Claimants.

(3) <u>Mechanic's Lien</u>. On January 11, 2017, Joseph Longaro, P.E. ("Longaro"), recorded an Affidavit Claiming Mechanic's and Materialman's Lien in Bastrop, Texas, asserting an unpaid claim in the amount of $764,289.30. Pursuant to the DIP Financing Order, Longaro was granted a replacement Lien against the Transferred Property, to the same extent, validity and priority of any Liens held by Longaro effective as of the Petition Date, but junior to the Liens granted to Crestline. Hoover also asserts a secured claim in the amount of approximately $141,000 based on an alleged mechanics' lien asserted against the Property.

26

### 4.5     Events Precipitating the Chapter 11 Filing

From early 2014 to the Petition Date, the Petitioning Creditors and others acting in concert with them embarked on a campaign to cast aspersions on the Debtor and Jim Foster; spread falsehoods about the Debtor's "viability," while privately acknowledging its fantastic prospects; and engaged in a campaign to "starve" the Debtor of cash and to oust Jim Foster from control of the Debtor. On March 7, 2014, Hasso Plattner Capital introduced several limited partners to McKinley Capital Partners ("McKinley) to discuss plans about uniting for the express purpose of removing Foster "as the controlling manager of XS Ranch" and to plan a "short-term strategy" for taking over the Debtor. In the course of that telephonic meeting, McKinley partner Dan Aguilar suggested that "If Foster doesn't play—we starve him of cash."

On February 17, 2015, the Rescission Claimants filed and commenced the Arbitration, against the Debtor, Mr. Foster and others ultimately alleging a litany of claims for breach of the Partnership Agreement, breach of fiduciary duty, breach of the covenant of good faith and fair dealing, accounting, dissolution, conversion, embezzlement, removal of the general partner, etc. The Rescission Claimants' express goal in the arbitration was to remove Foster and take control of the Debtor and the Property. Following fact and expert discovery by the parties throughout 2015 and early 2016, the Arbitrator (retired Honorable Richard M. Silver) conducted a three-week trial in February and March 2016. After submitting post-trial briefs, the parties provided closing arguments on April 27, 2016.

Having failed to prove their allegations of wrongdoing at trial, the Rescission Claimants chose to settle the Arbitration for nothing more than rescission of investment and return of their capital contributions. In or about July 2016, the parties entered into the Rescission Claimants Settlement, which *inter alia* provided for a stipulation for entry of arbitration award and the rescission of the Rescission Claimants' purchase of the limited partnership interests in the Debtor and restitution for their capital contributions in the collective amount of $28,575,001. On December 14, 2016, the Texas state court entered a judgment for rescission of the Rescission Claimants' investment in the Debtor, confirming the stipulated arbitration award.

XS Ranch Disclosure Statement

1    The litigation prosecuted by the Rescission Claimants caused the Debtor to spend years in

2    litigation, resulting in the incurrence of well in excess of a million dollars in professional and

3    litigation fees, along with the substantial distraction of the Debtor's time and attention away from

4    the Debtor's goals and business plan for the Property.

5    On December 23, 2016, the Petitioning Creditors filed an involuntary petition for relief

6    under Chapter 11 of the Bankruptcy Code against the Debtor.  On March 13, 2017, the Debtor

7    filed an answer to the involuntary petition.  On May 31, 2017, the Debtor consented to an order

8    for relief under Chapter 11.  On June 16, 2017, the Court entered an Amended Order on Debtor's

9    Consent to Entry of Order for Relief and Election to Convert Chapter 7 Case to a Case Under

10   Chapter 11 of the Bankruptcy Code authorizing the Debtor's consent to entry of an order for relief

11   effective June 1, 2017, and granting the Debtor's election to convert the chapter 7 case to a case

12   under chapter 11 of the Bankruptcy Code.

13   **4.6     The Debtor's Plan Financial Projections for the Debtor's Reorganization**

14   The Debtor has prepared the Financial Projections, copies of which are attached hereto as

15   **Exhibit 1A and B**, based on the scenario where the claims of the Rescission Claimants are

16   subordinated below equity Interest Holders and pari passu with equity Interest Holders[2].  The

17   Financial Projections present the entire financial template for the Debtor's reorganization effort.

18   The Financial Projections assumes that the Debtor will retain and continue to operate and manage

19   the Property.  As the Financial Projections indicate, the Debtor projects that the Net Cash Flow,

20   Net Sales Proceeds, and Net Financing Proceeds will be sufficient to pay all Allowed Claims in

21   full according to the treatment of such Allowed Claims as described herein.

22   The Financial Projections set forth the Debtor's estimate of the anticipated cash flow of

23   the Reorganized Debtor for the term of the Plan.  Projections of anticipated cash flow are based

24   on estimated lot and other land sales revenue, income generated by XS Water from the City

25   _____

26   [2] While the Debtor believes that the literal language of Section 510(b) unequivocally compels mandatory
     subordination of the claims of the Rescission Claimants below equity, in order to ensure that the Subordination

27   Litigation does not delay the Debtor's plan confirmation process, and knowing that the Rescission Claimants have
     acknowledged and admitted that their Claims are below Allowed Claims of General Unsecured Creditors, the Debtor
     also provides projections under a pari passu scenario, recognizing that there is no case law to support this elevated

28   pari passu scenario.

28

XS Region Disclosure Statement

under the terms of the Groundwater Agreement, as well as the projected expenses to continue with the Debtor's proposed development of the Property. The Financial Projections contain a description of material assumptions underlying the Financial Projections.

Although the Debtor has devoted considerable effort to the development of the Financial Projections and believes that the Financial Projections represent fairly the projected future cash flow of the Debtor, care should be taken in analyzing the Financial Projections as no guarantee exists that the Financial Projections can be met by the Debtor.

THE FINANCIAL PROJECTIONS SET FORTH IN THIS DISCLOSURE STATEMENT REPRESENT AN ESTIMATE OF FUTURE PERFORMANCE BASED UPON CERTAIN ASSUMPTIONS SET FORTH IN THE FINANCIAL PROJECTIONS. THESE FUTURE EVENTS MAY OR MAY NOT OCCUR, AND THE FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. BECAUSE OF THE UNCERTAINTIES INHERENT IN PREDICTIONS OF FUTURE EVENTS AND EVENTS OUTSIDE OF THE DEBTOR'S CONTROL, THE DEBTOR'S ACTUAL CASH FLOW MAY BE DIFFERENT FROM THAT PREDICTED, AND SUCH DIFFERENCE MAY BE MATERIAL AND ADVERSE TO THE INTERESTS OF CREDITORS.

## V.

## SIGNIFICANT EVENTS IN THE DEBTOR'S CHAPTER 11 CASE

### 5.1 Debtor's Operation as Debtor-in-Possession

Since the Petition Date, the Debtor has continued to operate as a "debtor-in-possession" subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code. The Debtor is authorized to operate its businesses in the ordinary course during the Chapter 11 proceedings.

### 5.2 Debtor In Possession Financing

After a diligent effort to obtain DIP Financing to assist the Debtor in its efforts to repurchase the Transferred Property, which property is critical to the value of the Debtor's Property and ability to reorganize, the Debtor successfully negotiated with Crestline an initial DIP

Case: 16-31367    Doc# 315    Filed: 12/22/17    Entered: 12/22/17 18:31:13    Page 31 of
56
Knighton Disclosure Statement

Financing proposal in the amount of $33 million. Based on the difficulty in timely obtaining Court approval of the initial DIP Financing pursuant to all of the terms contained in the initial DIP Financing proposal, the Debtor thereafter negotiated with Crestline, the Debtor's secured creditors, and Committee, the terms of a revised proposal for DIP Financing in the amount of $18.6 million. On September 14, the Court entered an order approving $18.6 million of DIP Financing, which provided the Debtor with the ability to, among other things, repurchase the Transferred Property, pay in full the Steiner 3rd Loan, Steiner 4th Loan, and Steiner 5th Loan, and provide the Debtor with monies to pay operating expenses and a portion of professional fees incurred in this Case.

### 5.3    Debtor's Motion to Exercise Option Agreements

In order to repurchase the Transferred Property, which, as described above, is critical to the marketability and value of the Debtor's Property, and thus, reorganization of the Debtor, the Debtor sought and on September 13, 2017, obtained Court approval to exercise and implement the Option Agreements. The Debtor used the DIP Financing to exercise the options and repurchase the Transferred Property from Steiner.

### 5.4    Debtor's Employment of Professionals

The Court entered an order on July 26, 2017 authorizing the employment of Winthrop Couchot Golubow Hollander, LLP ("WCGH") as the Debtor's general insolvency counsel. On August 24, 2017, the Court entered an order authorizing the employment of Sheppard, Mullin Richter & Hampton as general insolvency counsel for the Committee. On September 18, 2017, the Court entered an order authorizing the employment of Michael VanderLey as CRO and Force 10 to assist Mr. VanderLey in his CRO duties. On November 16, 2017, the Court entered an order authorizing the employment of Province as the Committee's financial advisor. On November 17, 2017, the Court entered an order authorizing the employment of Rimon P.C.

1

### 5.5    Setting of the Bar Date

2

Pursuant to the Notice of Chapter 11 Bankruptcy Case, entered by the Court on June 16,

3

2017, the Court set October 23, 2017 as the Bar Date for Creditors to file proofs of Claim against

4

the Debtor's Estate.[3]

5

### 5.6    Subordination of Rescission Claimants' Claims

6

Section 510(b) provides for subordination of any "claim arising from rescission of a

7

purchase or sale of a security of the debtor…" It is clear from the face of the Rescission

8

Claimants Settlement and the judgment that Rescission Claimants' Claims arise from rescission of

9

a purchase of securities of the Debtor, as those terms are defined under the Bankruptcy Code. In

10

fact, at a hearing on February 17, 2017, Judge Montali made a comment that Defendants' claims

11

were subject to mandatory subordination pursuant to 11 U.S.C. § 510(b), leaving open only the

12

question as to whom they are to be subordinated.

13

The Debtor believes that the literal language of the statute mandates that the Claims of the

14

Rescission Claimants be subordinated below equity. The Rescission Claimants acknowledge that

15

their Claims are to be subordinated below General Unsecured Claims, but assert that they should

16

be paid ahead of equity (i.e., that they have greater priority than equity). On or about October 10,

17

2017, the Debtor commenced Subordination Litigation against the Rescission Claimants to

18

subordinate their Claim. The results will affect distributions, as reflected in the Plan.

19

### VI.

20

### TREATMENT OF UNCLASSIFIED CLAIMS

21

As required by the Bankruptcy Code, the Plan places Claims and Interests into various

22

Classes according to their right to priority. However, certain types of Claims are not classified in

23

any Classes under the Plan. These Claims are deemed "unclassified" under the provisions of the

24

Code. They are not considered impaired and they do not vote on the Plan, because they are

25

automatically entitled to specific treatment provided for them in the Code. The treatment of these

26

unclassified Claims is as provided below.

27

---

[3] Claims of "governmental units" are excepted from the Bar Date but must be filed before November 28, 2017, 180 days after the date relief was entered.

28

31

KS Ashjian Disclosure Statement

### 6.1 Treatment of Allowed Administrative Claims

The Bankruptcy Code requires that all Allowed Administrative Claims be paid on the Effective Date of the Plan, unless a particular Holder agrees to a different treatment. The treatment of Allowed Administrative Claims is as described below. However, such Administrative Claims are continuing to be incurred. The Debtor shall be liable for the payment of the Allowed Administrative Claims, and the Allowed Administrative Claims shall be paid from any of the Distribution Account(s) in which funds exist.

#### (a) Repayment of Allowed Administrative Claims

Except to the extent that the Holder of an Allowed Administrative Claim agrees to a different treatment and subject to the Administrative Claims Bar Date set forth herein, the Plan Agent shall pay each Allowed Administrative Claim in full, in Cash, on the later of (i) the Effective Date, (ii) within ten (10) Business Days after the date such Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date such Allowed Administrative Claim becomes due according to its terms. Notwithstanding the foregoing, any Allowed Administrative Claim representing obligations incurred in the ordinary course of post-petition business by the Debtor (including without limitation post-petition trade obligations) shall be paid in full or performed by the Debtor in the ordinary course of business, in accordance with the terms of the particular obligation.

#### (b) Administrative Claims Bar Date

##### (i) General Administrative Claims Bar Date

All applications for final compensation of Professionals for services rendered and for reimbursement of expenses incurred on or before the Effective Date and all other requests for payment of Administrative Claims incurred before the Effective Date under Sections 507(a)(2) or 507(b) of the Bankruptcy Code (except only for (i) post-petition, ordinary course trade obligations incurred in the ordinary course of the Debtor's post-petition business, for which no bar date shall apply, and (ii) post-petition tax obligations, for which the bar date described in the

following Section shall apply) shall be Filed with the Bankruptcy Court and served upon the Debtor no later than the General Administrative Claims Bar Date, unless such date is extended by the Bankruptcy Court after notice to the Debtor. Any such request for payment of an Administrative Claim that is subject to the General Administrative Claims Bar Date and that is not Filed and served on or before the General Administrative Claims Bar Date shall be forever barred; any party that seeks payment of Administrative Claims that (i) is required to file a request for payment of such Administrative Claims and (ii) does not file such a request by the deadline established herein shall be forever barred from asserting such Administrative Claims against the Debtor, its estate, or any of its property.

### (ii) Administrative Tax Claims Bar Date

Except with respect to the County, all requests for payment of Administrative Claims by a governmental unit for Taxes (and for interest and/or penalties related to such Taxes) for any tax year or period, all or any portion of which occurs or falls within the period from and including the Petition Date through and including the Effective Date ("Tax Administrative Claims") and for which no bar date has otherwise previously been established, must be filed and served on the Debtor on or before the later of (i) sixty (60) days following the Effective Date; and (ii) 180 days following the filing of the tax return for such taxes for such tax year or period with the applicable governmental unit. Any Holder of any Tax Administrative Claims that is required to file a request for payment of such taxes and does not file and properly serve such a request by the applicable bar date shall be forever barred from asserting any such Tax Administrative Claims against the Debtor.

### (c) Summary of Estimated Allowed Administrative Expenses

The following is a summary of the involuntary gap claims asserted against the Debtor's estate for services rendered and costs incurred from the Petition Date through the Order for Relief:

33

| Involuntary Gap Administrative Claims | | | | |
|---|---|---|---|---|
| | | **A** | **B** | **A-B** |
| **Claimant** | **Nature** | **Accrued** | **Paid** | **Balance** |
| Force 10 | CRO/Financial | $98,518 | $24,630 | $73,888 |
| WCGH | Debtor's general counsel | 86,320 | 21,580 | 64,740 |
| **Total** | | **$1,505,713** | **$627,437** | **$138,628** |

The following is a summary of estimated Administrative Claims incurred and paid after the Order for Relief, as well as an estimate of amounts that will be owed as of the Effective Date:

| Administrative Claims Other Than Non-Involuntary Gap | | | | | |
|---|---|---|---|---|---|
| | | **A** | **B** | **C** | **A-B+C** |
| **Claimant** | **Nature** | **Accrued[4]** | **Paid** | **Estimated Additional Fees[5]** | **Estimated Balance[6]** |
| Force 10 | CRO/Financial | $486,713 | $211,377 | $175,000 | $450,336 |
| WCGH | Debtor's general counsel | 689,000 | 382,060 | 285,000 | 591,940 |
| Rimon | Debtor's special counsel | 69,000 | 34,000 | 75,000 | 110,000 |
| Sheppard | Committee's counsel | 172,000 | 0 | 98,000 | 270,000 |
| Province | Committee's financial advisor | 45,000 | 0 | 30,000 | 75,000 |
| Squar Milner | Debtor's tax accountants | 44,000 | 0 | 38,000 | 82,000 |
| **Total** | | **$1,505,713** | **$627,437** | **$701,000** | **$1,579,276** |

**6.2    Treatment of Tax Claims**

Tax Claims are certain unsecured income, employment and other taxes described by Code Section 507(a)(8).  The Code requires that each holder of such a Section 507(a)(8) priority tax claim receive the present value of such Claim in deferred cash payments, over a period not

---

[4] This is an estimate of Administrative Claims, but excluding involuntary gap claims, accrued through 11/ 30/17.
[5] This is an estimate of additional fees and expenses incurred from 12/1/17 – 3/31/18.
[6] This is an estimate of fees and expenses owing as of March 31, 2018.  Note, this does not include bonus(es) that are anticipated to be sought by Force 10 at the end of the Case based on the financing obtained and success realized in this Case, as contemplated by Force 10's retainer agreement.

34

exceeding five (5) years from the Petition Date and that such treatment not be less favorable than the treatment accorded to nonpriority unsecured creditors.

At the election of the Debtor, the Holder of each Allowed Tax Claim shall be entitled to receive, on account of such Claim, (i) equal cash payments on the last Business Day of each three-month period following the Effective Date, during a period not to exceed five (5) years after December 23, 2016, totaling the principal amount of such Claim plus simple interest on any unpaid balance from the Effective Date, calculated at the interest rate available on ninety (90) day United States Treasuries on the Effective Date, (ii) such other treatment agreed to by the Holder of the Allowed Priority Tax Claim and the Debtor, provided such treatment is on more favorable terms to the Debtor than the treatment set forth in clause (i) hereof, or (iii) payment of the full Allowed Priority Tax Claim in Cash on the Effective Date. The Allowed Priority Tax Claims are estimated to aggregate approximately $54,250, consisting of $43,924 owing to the County, $9,524 owed to the City, and $800 owed to the Franchise Tax Board.

## VII.

## CLASSIFICATION OF CLAIMS AND INTERESTS

As required by the Code, the Plan places Claims and Interests into various Classes according to their right to priority and other relative rights. The Plan specifies whether each Class of Claims or Interests is impaired or unimpaired, and the Plan sets forth the treatment each Class will receive. The table below lists the Classes of Claims established under the Plan and states whether each particular Class is impaired or left unimpaired by the Plan. A Class is "unimpaired" if the Plan leaves unaltered the legal, equitable and contractual rights to which the Holders of Claims or Interests in the Class are entitled, with certain exceptions specified in the Bankruptcy Code.

The Debtor has not yet completed its investigation on whether or not the Claims and Interests are Allowed and their listing herein should not be construed as providing for Allowance under the Plan.

Case: 16-31367    Doc# 315    Filed: 12/22/17    Entered: 12/22/17 18:31:13    Page 37 of
56

| CLASSIFICATION OF CLAIMS AND INTERESTS | | | | |
|---|---|---|---|---|
| **Class** | **Claimant** | **Collateral** | **Estimated Claim/Interest** | **Impaired Status** |
| 1 | Governmental Units | Property | $59,000 | Unimpaired |
| 2.1 | Steiner | First Purchased Property | 10,658,000 | Impaired |
| 2.2 | Steiner | First Purchased Property | 1,600,000 | Impaired |
| 3 | Mechanics Lien Creditors | Property | 906,000 | Impaired |
| 4 | Priority Unsecured Creditors | n/a | 0 | Unimpaired |
| 5 | General Unsecured Creditors | n/a | 4,700,000 | Impaired |
| 6 | Subordinated Rescission Claimants | Property | 28,575,001 | Unimpaired/ Impaired |
| 7 | Equity Interest Holders | n/a | 25,700,000 | Unimpaired |

# VIII.

## THE PLAN'S TREATMENT OF

## CLASSIFIED CLAIMS AND INTERESTS

The following is the Plan's treatment of Allowed Claims and Interests.

**8.1**    **Class 1:  Allowed Secured Claims of Governmental Units.**  Class 1 consists of any Allowed Secured Claim of the County, Class 1 is unimpaired by this Plan.  The following is a summary description of the treatment of the members of Class 1[7]:

      8.1.1    Allowance of Secured Claim.  The members of Class 1 shall be allowed a Secured Claim in an amount equal to such Creditor's Allowed Claim, plus all applicable costs, fees, charges, and interest, if any.

      8.1.2    Payment of Allowed Secured Claim.  The members of Class 1 shall be paid in full within thirty days of the Effective Date.

---

[7] For more details on the treatment, see the Plan accompanied herewith.

**8.2** **Classes 2.1–2.2: Allowed Secured Claims of Steiner.** Classes 2.1–2.2 are impaired by this Plan. The following is a summary description of treatment of Steiner's Allowed Secured Claims[8].

8.2.1 <u>Lien</u>. Steiner shall retain its underlying lien on the Property, to the same extent, priority and validity as existed as of the Petition Date, except as modified by any Court order entered in this Case;

8.2.2 <u>Steiner Loan Documents</u>. Except as modified in this Plan or any Court order entered in this Case, the terms of the Steiner Loan Documents shall remain in full force and effect.

8.2.3 <u>Default</u>. The Debtor shall have Grace Period within which to cure any asserted default.

8.2.4 <u>Allowance and Payment</u>. In addition to the foregoing, Steiner's Claims shall be treated as fully secured Allowed Claims in the Allowed Amounts, and shall be paid as set forth below:

---

[8] For more details on the treatment, see the Plan accompanied herewith.

Kronenberger Disclosure Statement

| Class | Claim | Estimated Allowed Claim[9] | Payments |
|-------|-------|---------------------------|----------|
| 2.1 | Steiner 1st Claim | 10,658,000 | The Debtor shall cure all arrearages due and owing to Steiner on account of the Steiner 1st Claim as of the Effective Date, which are estimated to be $658,000. The Debtor will make quarterly payments to Steiner on account of the Steiner 1st Claim, each in the amount $225,000, commencing on the first (1st) Business Day of the third (3rd) full month following the Effective Date and continuing every three months thereafter until the Steiner New Maturity Date. The Debtor shall pay the principal balance, which is currently $10,000,000, on the Steiner New Maturity Date for the Steiner 1st Loan. |
| 2.2 | Steiner 2nd Claim | 1,600,000 | The Debtor shall cure all arrearages due and owing to Steiner on account of the Steiner 2nd Claim as of the Effective Date, which are estimated to be $100,000. The Debtor will make quarterly payments to Steiner on account of the Steiner 2nd Claim, each in the amount $33,750, commencing on the first (1st) Business Day of the third (3rd) full month following the Effective Date and continuing ever three months thereafter until the Steiner New Maturity Date. The Debtor shall pay the principal balance, which is currently $1,500,000, on the Steiner New Maturity Date for the Steiner 2nd Loan. |

**8.3    Class 3:  Allowed Secured Claims of Mechanics Lien Creditors.**  Class 3 consists of any Allowed Secured Claim held by a Mechanics Lien Creditor.  Class 3 is impaired by this Plan.  The following is a summary description of the treatment of the Allowed Secured Claim of the members of this Class.[10]

8.3.1    <u>Allowance of Secured Claim</u>.  The members of Class 3 shall be allowed a Secured Claim in an amount equal to such Creditor's Allowed, which is estimated at $906,000.

8.3.2    <u>Payment of Allowed Secured Claim</u>.  The members of Class 3 shall be paid in full within thirty days of the Effective Date.

**8.4    Class 4:  Allowed Priority Unsecured Claims.**  Class 4 consists of any Allowed Priority Claim.  Class 4 is impaired by this Plan.  Members of Class 4 shall be paid in full within thirty days of the Effective Date, plus interest accruing after the Effective Date at the federal judgment rate as of the Petition Date[11].  For more details, see the Plan accompanied herewith.

---

[9] Estimated as of the Petition Date.

[10] For more details on the treatment, see the Plan accompanied herewith.

[11] Under 28 U.S.C. § 1961, the federal judgment rate is the rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System.  Since the petition was filed

38

**8.5** **Class 5: Allowed General Unsecured Claims.** Class 5 consists of all Holders of Allowed Claims that have no security or priority and not subject to subordination (i.e., general unsecured claims). Class 5 is impaired by this Plan. Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a different treatment, Members of Class 5 shall be paid in full within thirty days of the Effective Date, plus interest accruing ten days after the Effective Date at the federal judgment rate as of the Petition Date[12]. For more details on the treatment, see the Plan accompanied herewith.

**8.6** **Class 6: Allowed Subordinated Rescission Claims.** Class consists of any Allowed Claim of the Rescission Claimants. Class 6 is unimpaired and deemed to accept the Plan because the Plan does not alter the rights of the members of this Class, but rather provides treatment consistent with the members' rights determined and dictated by the Court and Bankruptcy Code. Notwithstanding, if members of Class 6 are subordinated below equity, for purposes of confirmation of the Plan, the Debtor will treat this class as impaired because it will receive no distribution in this Case, and thus deem the Class as having rejected the Plan.

The Rescission Claims will be subordinated through adjudication or settlement, as a result of Subordination Litigation prosecuted by the Estate. The treatment of the Holders of Allowed Claims in Class 6 will depend upon the level to which their Allowed Claims are subordinated by order of the Court. The following is a summary description of the treatment of the Members of Class 6:[13]

| Subordination Results | Treatment |
|---|---|
| If Rescission Claims are subordinated below equity | Member of Class 6 will receive no Distributions. |
| If Rescission Claims are subordinated pari passu with equity | Members of Class 6 will receive Distributions at the same time Distributions are made to members of Class 7 until members of Class 6 have received Distributions in the aggregate of $28,575,001. Distributions to members of Class 6 will be calculated based on their |

---

on December 23, 2016, the applicable rate is 0.85%, which is the last published rate on December 30, 2016. See, https://www.treasury.gov/resource-center/data-chart-center/interest-rates/Pages/TextView.aspx?data=yieldYear&year=2016.

[12] See footnote 2.

[13] For more details on the treatment, see the Plan accompanied herewith.

Case: 16-31367   Doc# 315   Filed: 12/22/17   Entered: 12/22/17 18:31:13   Page 41 of 56

| | |
|---|---|
| | Capital Pro Rata share. For an estimate of timing, see Financial Projections. |

**8.7** **The Plan's Treatment of Holders of Allowed Interests (Class 7).** Class 7 is comprised of the Interests in all Assets held by the Debtor. Class 7 is unimpaired. The members of this Class shall retain their interests in the Debtor.

The treatment of the holders of Allowed Class 7 Interests under this Plan will depend upon the level to which the Rescission Claimants' claims are subordinated by order of the Court based on the pending Subordination Litigation. The following is a summary description of the treatment of Members of Class 7 Interests[14]:

| Subordination Results | Treatment |
|---|---|
| If Rescission Claims are subordinated below equity | Members of Class 7 will receive Distributions, on a Pro Rata basis, pursuant to the terms of the Partnership Agreement, as may be amended, if necessary, to implement the Plan. For an estimate of timing, see Financial Projections. |
| If Rescission Claims are subordinated pari passu with equity | Members of Class 7 will receive Distributions pursuant to the terms of the Partnership Agreement, as may be amended, if necessary, to implement the Plan. Distributions to members of Class 7 will be calculated based on their Capital Pro Rata share until such time as members of Class 6 have received Distributions in the aggregate of $28,575,001. Thereafter, Distributions to members of Class 7 shall be paid, on a Pro Rata basis, pursuant to the terms of the Partnership Agreement. For an estimate of timing, see Financial Projections. |

## IX.

## ACCEPTANCE OR REJECTION OF THE PLAN

**9.1** **Introduction.** PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX. The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing Claims. The Debtor cannot represent that the discussion contained below is a complete summary of the law on this topic.

---

[14] For more details on the treatment, see the Plan accompanied herewith.

Many requirements must be met before the Bankruptcy Court can confirm the Plan. Some of the requirements include that the Plan must be proposed in good faith, acceptance of the Plan, whether the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and whether the Plan is feasible. The requirements described herein are <u>not</u> the only requirements for confirmation.

**9.2** <u>**Who May Object to Confirmation of the Plan.**</u> Any party in interest may object to the confirmation of the Plan.

**9.3** <u>**Who May Vote to Accept/Reject the Plan.**</u> A Holder of a Claim or Interest has a right to vote for or against the Plan if that Holder of the Claim or Interest has a Claim which is both (1) Allowed or Allowed for voting purposes and (2) Classified in an impaired Class.

**9.4** <u>**What Is an Allowed Claim/Interest.**</u> As noted above, a Holder of Claim or Interest must first have an Allowed Claim or Allowed Interest to vote.

**9.5** <u>**What Is an Impaired Class.**</u> A Class is impaired if the Plan alters the legal, equitable, or contractual rights of the Claims or Interests in that Class, other than the right to accelerate the Claim upon certain kinds of defaults. In this case, the Debtor believes that Classes 2.1, 2.2, 3, and 5 are impaired. While the Plan will not be altering the legal, equitable, or contractual rights of members of Class 6, if members of Class 6 are subordinated below equity, for purposes of confirmation of the Plan, the Debtor will treat Class 6 as impaired because it will receive no distribution in this Case and thus deem the Class as having rejected the Plan.

**9.6** <u>**Who Is Not Entitled to Vote.**</u> The following four types of Claims are <u>not</u> entitled to vote: (1) Claims that have been disallowed; (2) Claims in unimpaired Classes; (3) Claims entitled to priority pursuant to Bankruptcy Code Sections 507(a)(2), (a)(3) and (a)(8) and Claims in Classes that do not receive or retain any value under the Plan. Claims in unimpaired Classes are not entitled to vote because such Classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to Bankruptcy Code Section 507 (a)(2), (a)(3) and (a)(8) are not entitled to vote because such Claims are not placed in Classes and they are required to receive certain treatment specified by the Bankruptcy Code. Claims in Classes that do not receive or

retain any property under the Plan do not vote because such Classes are deemed to have rejected the Plan. The Debtor believes that all Classes, except for Classes 4, 6 and 7 are entitled to vote.

EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

**9.7     Who Can Vote in More than One Class.**  A creditor whose Claim has been Allowed in part as a Secured Claim and in part as an Unsecured Claim is entitled to accept or reject a Plan in both capacities by casting one ballot for the secured part of the Claim and another ballot for the Unsecured Claim.  Also, a Creditor may otherwise hold Claims in more than one Class and may vote the Claims held in each Class.

**9.8     Votes Necessary for a Class to Accept the Plan.**  A Class of Claims is deemed to have accepted the Plan when more than one-half (1/2) in number and at least two-thirds (2/3rds) in dollar amount of the Claims vote to accept the Plan.  A Class of interests is deemed to have accepted the Plan when Holders of at least two-thirds (2/3rds) in amount of the interest holders of such Class vote to accept the Plan.  If no Holders of Claims or Equity Interests eligible to vote in a particular Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the Holders of such Claims or Equity Interests in such Class.

**9.9     Treatment of Nonaccepting Class(es).**  As noted above, even if there are impaired Classes that do not accept the proposed Plan, the Bankruptcy Court may nonetheless confirm the Plan if the nonaccepting Classes are treated in the manner required by the Code and at least one impaired Class of Claims accepts the Plan.  The process by which a plan may be confirmed and become binding on non-accepting Classes is commonly referred to as "cramdown."  The Bankruptcy Code allows the Plan to be "crammed down" on nonaccepting Classes of Claims or interests if it meets all statutory requirements except the voting requirements of Section 1129(a)(8) of the Bankruptcy Code and if the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each impaired Class that has not voted to accept the Plan, as set forth in Section 1129(b) of the Bankruptcy Code and applicable case law.

42

KS Region Disclosure Statement

**9.10      Request for Confirmation Despite Nonacceptance by Impaired Class(es).**  The Plan Proponent will ask the Bankruptcy Court to confirm the Plan by cramdown on any impaired Class if such Class does not vote to accept the Plan.

**X.**

**MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN**

**10.1      Introduction.**  This Section is intended to address how the Debtor intends to fund and to implement the obligations to Creditors under the Plan.  It thus provides information regarding funding sources for the Plan obligations and other material issues bearing upon the performance of the Plan.

**10.2      Source of Funds.**  The payments due under the Plan to holders of Allowed Claims and Allowed Interests will be paid from the Net Cash Flow, Net Sales Proceeds, and Net Financing Proceeds, and the prosecution and liquidation of the Debtor's Avoidance Actions, if any.  The Debtor has obtained from Crestline an Exit Financing commitment, which provides the Debtor with sufficient funds to pay timely all obligations due on or about the Effective Date, as well as working capital funds upon the Debtor's raise of Post-Closing Equity.  A true and correct copy of the Commitment Letter is attached as **Exhibit 3** to the Plan.  The Debtor has been and continues to be in negotiations with investors who have been conducting due diligence on additional investment in and/or financing to the Debtor.

The following is a summary of the material terms of Crestline's Exit Financing:

| Credit Facility | $30,000,000 |
|---|---|
| Commitment Expiration | (i) at Crestline's election in event of a material breach by the Debtor; (ii) January 31, 2018, unless an order is entered approving the Disclosure Statement by such date; or (iii) March 31, 2018, unless the credit facility is closed by such date. |
| Initial Funding Date | Date that all conditions precedent have been satisfied |
| Maturity Date | 3 years after the Initial Funding Date |
| Interest Rate | Current/Cash Pay rate:  7% fixed rate per annum, payable quarterly |
| | Deferred Rate:  7% fixed per annum, simple interest, due and payable on the Maturity Date. |
| | Deferred Rate:  4% payable on demand |
| Warrants | Crestline shall be granted warrants equal to 20% of the number of |

43

| | shares of stock at closing on a fully diluted basis |
|---|---|
| Facility Fee | 2% of the total facility amount |
| Mandatory Prepayment | Mandatory prepayments of (i) 100% from debt issuances, asset sales, cash flow, tax refunds, and insurance proceeds and (ii) 50% from all equity issuances other than Post-Closing Equity |
| Liens | (i) First lien on all tangible and intangible assets of the Debtor and (ii) first lien on all tangible and intangible assets and equity interests of the Guarantors; (iii) second lien on 4,372 acres of land securing the Steiner 1st Claim and Steiner 2nd Claim. |
| Conditions | (i) Court shall have entered a final order confirming the Plan; (ii) the principal balance owing on the Steiner 1st Claim and Steiner 2nd Claim shall not become due until after the maturity date of the Exit Financing; (iii) Debtor's delivery of a detailed budget of planned expenditures and sequence of work to be performed acceptable to Crestline; (iv) Delivery to Crestline of an updated Phase I environmental report; and (v) other satisfactory due diligence. |
| Post-Closing Equity | The Debtor has nine months to raise Post-Closing Equity to fund working capital and critical infrastructure in accordance with the Budget. Any equity capital raised in excess of $10,000,000 is subject to the mandatory prepayment provisions described above.<br><br>If the Debtor is unable to timely raise the Post-Closing Equity, the Debtor shall commence and supervise an Orderly Liquidation of its Assets. The Debtor shall identify and interview prospective real estate brokerage firms, from which it will select and retain one for the marketing and sale of the Debtor's Assets, after consultation with Crestline. Thereafter, the Debtor will assist the retained real estate firm in its efforts to market and sell the property, including, e.g., providing property tours and evaluating purchase offers. The Orderly Liquidation shall be concluded within twelve months from the date that the Debtor is unable to timely raise the Post-Closing Equity. |

**10.3** **Management of the Debtor and Retention of Professionals After Effective Date.** After the Effective Date, it is anticipated that the Debtor's business affairs will be managed by a committee consisting of the Debtor's current general partner, the Plan Agent, and such other persons that may be appointed by the Debtor, the Plan Agent, or sources of additional exit financing provided post-confirmation. The Plan Agent or Debtor shall be entitled to retain, employ and compensate Professionals, in order to assist with the Debtor's obligations and rights under the terms of the Plan. The Plan Agent or the Debtor may also employ or contract with other persons or entities to perform the obligations created under the Plan. Any Professional employed by the Plan Agent or the Debtor after the Effective Date, shall be entitled to obtain from the

44

Debtor payment of the Professional's fees and costs, in the ordinary course, without any need to give notice to Creditors or other parties-in-interest or to obtain any approval of the Bankruptcy Court.  Notwithstanding the foregoing, if the Debtor or the Plan Agent should fail to pay any post-Effective Date fees and costs of a Professional entitled to such payment, within thirty (30) days after the Professional's rendering of its billing statement, the Professional shall be entitled to seek, by application filed in accordance with the Bankruptcy Rules, an order of the Bankruptcy Court requiring the Debtor or the Plan Agent to forthwith pay to the Professional its fees and costs.

**10.4    Implementation of Plan.**  The Debtor and Plan Agent shall be authorized to, and shall, take all acts appropriate to implement the provisions of the Plan, including, without limitation, initiating and thereafter completing infrastructure and other horizontal improvements to the Property and selling lots to builders, liquidating or otherwise disposing of the Assets, making Distributions to holders of Allowed Claims, objecting to Disputed Claims, and prosecuting or settling any Avoidance Action or Causes of Action, entering into financing and other transactions, and executing such documents as may be necessary to implement the terms of the Plan, including, without limitation, causing the Debtor to amend its agreement of limited partnership to authorize acts consistent with and necessary to implement the Plan.

**10.5    Representative of the Estate.** Except as provided expressly to the contrary by the Plan, the Plan Agent shall be, and hereby is, appointed as the representative of the Estate pursuant to sections 1123(a)(5), 1123(a)(7) and 1123(b)(3)(B) of the Bankruptcy Code and, as such, shall be vested with the authority and power, subject to the provisions of the Plan, to take, among others, the following acts on behalf of the Debtor:  (a) manage, administer and dispose of the Assets for the benefit of holders of Allowed Claims; (b) file, litigate, prosecute, settle, adjust, retain, enforce, collect and abandon any Causes of Action in the name of, and for the benefit of, the Estate; (c) make all Distributions provided for by the Plan; and (d) such  other acts as may be appropriate to administer, wind-down, and close the Case.  Except as provided expressly to the contrary by the Plan, as the representative of the Estate, the Plan Agent shall succeed to all of the rights and powers of the Debtor and the Estate with respect to all Causes of Action, and shall be

Case: 16-31367    Doc# 315    Filed: 12/22/17    Entered: 12/22/17 18:31:13    Page 47 of 56

KS Region Disclosure Statement

substituted for, and shall replace, the Debtor and the Estate as the party-in-interest in all such litigation pending as of the Effective Date.

**10.6** **Avoidance Actions.** Unless an Avoidance Action is expressly waived, relinquished, released, compromised or settled in the Plan or in a Final Order, all rights with respect to such Avoidance Actions are reserved and the Debtor or the Plan Agent may pursue such Avoidance Actions. Notwithstanding the foregoing, the Debtor or the Plan Agent shall not settle or abandon an Avoidance Action valued at greater than $50,000 except upon ten (10) days' prior written notice and opportunity to object. Any disputes concerning the settlement or abandonment of an Avoidance Action shall be submitted to the Bankruptcy Court for resolution on no less than ten (10) days' notice to the objecting party.

**10.7** **Collection of Avoidance Actions Recoveries.** All Avoidance Actions Recoveries realized or obtained by the Debtor or the Plan Agent shall be promptly deposited into the applicable Distribution Account(s). Except as otherwise provided in the Plan and the Confirmation Order, the Avoidance Actions Recoveries shall be free and clear of all claims and liens and shall only be expended in accordance with the provisions of the Plan.

## XI.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**11.1** **Executory Contracts Potentially Being Assumed.** The Debtor seeks by the Plan to assume all those contracts identified on the Schedule of Assumed Contracts attached as **Exhibit 1** to the Plan. The Debtor may add any executory contracts or unexpired leases to this exhibit up to and including the Confirmation Date.

**11.2** **Executory Contracts Being Rejected.** The Debtor rejects by the Plan those executory contracts and unexpired leases attached as **Exhibit 2** to the Plan. The Debtor reserves the right to amend **Exhibit 2** to the Plan to add or delete unexpired leases and executory contracts on this exhibit up to and including the Confirmation Date. All executory contracts or unexpired leases not rejected by the Confirmation Date shall be deemed assumed.

**11.3** **Bar Date for Rejection Damages.** Any Claim arising out of the rejection of an executory contract or unexpired lease shall be forever barred and shall not be enforceable against

46

the Debtor, its Affiliates, its successors, or the Project, and shall not be entitled to any distribution under the Plan, unless a Proof of Claim for such Claim is filed and served on the Debtor within thirty (30) days after the receipt of a notice of the rejection of any contract or lease.

**11.4    Changes in Rates Subject to Regulatory Commission Approval.**  The Debtor is not subject to governmental regulatory commission approval of any rates**.**

**XII.**

**BEST INTEREST OF CREDITORS TEST AND PLAN FEASIBILITY**

**12.1    Best Interest of Creditors Test.**  The "Best Interest of Creditors" test must be satisfied even if the Plan is accepted by each impaired Class of Claims and if any Holder of an Allowed Claim objects to the Plan on such basis.  The "Best Interests Test" requires the Bankruptcy Court to find either that either (i) <u>all</u> Holders of Claims in an impaired Class of Claims have accepted the Plan or (ii) the Plan provides each Holder of Allowed Claims of an impaired Class who has not accepted the Plan with a recovery of property of a value, as of the effective date of the Plan, that is not less than the amount that such Holder would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.  As set forth below, the Debtor's Creditors will clearly receive a distribution under the Plan equal to or greater than they would receive in a hypothetical Chapter 7.

Attached hereto as **Exhibit 2** is a liquidation analysis.  The Debtor asserts that the estimated liquidation value of the Property is $62.5 million.  <u>See</u>, Section 1.3, above.  The liquidation value of the Debtor's Assets under a hypothetical Chapter 7 proceeding would be approximately $25.7 million, which provides for the payment in full of all Allowed Claims entitled to be paid in this Case.  As set forth in the Financial Projections, the Debtor believes that the Net Cash Flow, Net Sales Proceeds, Net Financing Proceeds, Post-Closing Equity and any additional financing raised will be sufficient to pay in full the Allowed Claims of all Creditors entitled to a distribution in this Case.  Accordingly, the Debtor satisfies the best interest of creditors test.

**12.2    Feasibility.**  In addition, in order to confirm the Plan, the Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the liquidation or the need for

47

further financial reorganization of the Debtor.  This requirement is imposed by Section 1129(a)(11) of the Bankruptcy Code and is generally referred to as the "feasibility" requirement.  As set forth below, this requirement is also satisfied.

The Debtor shall make all payments due under the Plan to holders of Allowed Claims and Allowed Interests from the Net Cash Flow, Net Sales Proceeds, Net Financing Proceeds, and the prosecution and liquidation of the Debtor's Avoidance Actions, if any.  The Debtor's ability to make all payments due under the Plan is based upon the Financial Projections attached hereto as **Exhibit 1A and 1B,** which projections are premised upon the Debtor's existing contracts and vast knowledge of development needs, in general, and the specific needs for the Property.

**XIII.**

**LIMITATION OF LIABILITY**

**13.1    No Liability for Solicitation or Participation.**  As specified in Section 1125(e) of the Bankruptcy Code, entities that solicit acceptances or rejections of the Plan and/or that participate in the offer, issuance, sale, or purchase of securities offered or sold under the Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, shall not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of securities.

**13.2    Limitation of Liability.**  To the full extent permissible under 11 U.S.C. §1125(e), as of the Effective Date, neither the Plan Agent or the Debtor, nor their Affiliates, nor any of their respective members, officers, directors, employees and other agents, advisors, attorneys and accountants shall have or incur any liability to any Holder of any Claim or Interest or any other Person for any act or omission in connection with or arising out of the negotiation, preparation and pursuit of confirmation of the Plan, the Disclosure Statement, the consummation of the Plan, the administration of the Plan, the Case or the property to be distributed under the Plan except:  (a) the Plan Agent or the Debtor shall be liable for the performance of obligations assumed by it or imposed upon it under or by the Plan; and (b) for liability based on willful misconduct as finally determined by a Final Order of the Bankruptcy Court.  The Plan Agent, the Debtor and their

48

Affiliates, and each of their respective officers, directors, employees and other agents, advisors, attorneys and accountants shall be entitled to rely, in every respect, upon the advice of counsel with respect to their duties and responsibilities under or with respect to the Plan.

## XIV.

## CONDITIONS TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN

**14.1    Conditions Precedent to Plan Confirmation.**  The only condition precedent to confirmation of the Plan is that the Bankruptcy Court shall have entered a Confirmation Order in form and substance reasonably acceptable to the Debtor.

**14.2    Conditions Precedent to Plan Effectiveness.**  The following are conditions precedent to the effectiveness of this Plan and the occurrence of the Effective Date:

14.2.1  the Confirmation Order shall be a Final Order in form and substance reasonably satisfactory to the Debtor;

14.2.2  All agreements, instruments and other acts contemplated by, or to be entered into, or completed pursuant to, or in order to facilitate the implementation of, this Plan, as determined by the Debtor, including, without limitation, any and all debtor and/or equity financing agreements, purchase agreements, and related closing documents shall have been duly and validly executed and delivered by the parties thereto and completed, and all conditions to their effectiveness shall have been satisfied or waived, except only for the entry of the Confirmation Order, and all funding from the re-financing shall have been effected.

**14.3    Waiver of Conditions**.  The conditions set forth in Sections 16.1 and 16.2 hereof may be waived by the Debtor without notice, leave or order of the Bankruptcy Court, and without any formal action other than proceeding to obtain the Confirmation Order and consummate this Plan.

49

**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall not be limited under the Plan and the Bankruptcy Court's jurisdiction shall apply to the fullest extent possible under applicable law.

**XVI**

**MODIFICATION OR WITHDRAWAL OF PLAN**

**16.1    Modification of Plan.**  At any time prior to confirmation of the Plan, the Debtor may supplement, amend or modify the Plan.  After confirmation of the Plan,  the Plan Agent or the Debtor may (i) apply to the Bankruptcy Court, pursuant to Section 1127 of the Bankruptcy Code, to modify the Plan; and (ii) apply to the Bankruptcy Court to remedy defects or omissions in the Plan or to reconcile inconsistencies in the Plan.

**16.2    Nonconsensual Confirmation.**  In the event that any impaired Class of Claims or Interests shall fail to accept the Plan in accordance with Section 1129(a)(8) of the Bankruptcy Code, the Plan Proponent (i) may request that the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the Bankruptcy Code, and (ii) in accordance with the Plan, and may modify the Plan in accordance with Section 1127 of the Bankruptcy Code.

**XVII**

**TAX CONSEQUENCES OF PLAN**

**17.1    Introduction.**  The implementation of the Plan may have federal, state and local tax consequences to the Debtor and the Holders of Claims and Interests.  No tax opinion has been sought or will be obtained with respect to any tax consequences of the Plan.  This Disclosure Statement does not constitute, and is not intended to constitute, either a tax opinion or tax advice to any person, and the summary contained herein is provided for informational purposes only.

The discussion below summarizes only certain of the federal income tax consequences associated with the Plan's implementation.  This discussion does not attempt to comment on all aspects of the federal income tax consequences associated with the Plan, nor does it attempt to consider various facts or limitations applicable to any particular Holder of a Claim or Interest

50

which may modify or alter the consequences described herein.  A Holder of a Claim or Interest may find that the tax consequences of the Plan to such Holder differs materially from the tax consequences discussed below because of such Holder's facts and circumstances.  This discussion does not address state, local or foreign tax consequences or the consequences of any federal tax other than the federal income tax.

The following discussion is based upon the provisions of the Internal Revenue Code, the regulations promulgated thereunder, and existing judicial decisions and administrative rulings.  In light of the rapidly-changing nature of tax law, no assurance can be given that legislative, judicial or administrative changes will not be forthcoming that would affect the accuracy of the discussion below.  Any such changes could be material and could be retroactive with respect to the transactions entered into or completed prior to the enactment or promulgation thereof.  The tax consequences of certain aspects of the Plan are uncertain due to the lack of applicable legal authority and may be subject to judicial or administrative interpretations that differ from the discussion below.

HOLDERS OF CLAIMS AND INTERESTS ARE ADVISED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM AND TO THE DEBTORS OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.

**17.2**   **Federal Income Tax Consequences to the Debtor.**  Consummation of the Plan may reduce substantially the amount of the Debtor's aggregate outstanding indebtedness.  In general, the Internal Revenue Code provides that a taxpayer who realizes a discharge of indebtedness must include the Debt Discharge Amount in its gross income in the taxable year of discharge to the extent that the Debt Discharge Amount exceeds any consideration given for such discharge.[15]  However, if a taxpayer is in a Title 11 case and the discharge of indebtedness occurs pursuant to a plan approved by the Bankruptcy Court, as in this Case, then such discharge of

---

[15] No income from the discharge of indebtedness is realized to the extent that payment of the liability being discharged would have given rise to a deduction.

51

indebtedness is specifically excluded from gross income.  Accordingly, the Debtor will not be required to include in income any Debt Discharge Amount as a result of Plan transactions.

Although the Debtor will not have to include the Debt Discharge Amount resulting from Plan transactions in its gross income, there will be a tax effect.  The Internal Revenue Code requires certain tax attributes of a debtor to be reduced by the Debt Discharge Amount excluded from income.  Tax attributes are reduced in the following order of priority:  net operating losses and net operating loss carryovers; general business credits; minimum tax credits; capital loss carryovers; basis of property of the taxpayer; passive activity loss or credit carryovers; and foreign tax credit carryovers.  Tax attributes are generally reduced by one dollar for each dollar excluded from gross income, except that general tax credits, minimum tax credits and foreign tax credits are reduced by 33.3 cents for each dollar excluded from gross income.

An election can be made to alter the order of priority of attribute reduction by first applying the reduction against depreciable property held by the taxpayer in an amount not to exceed the aggregate adjusted basis of such property.  The Debtor has not yet decided whether to make such election.  The deadline for making such election is the due date (including extensions) of the Debtor's federal income tax return for the taxable year in which such debt is discharged pursuant to the Plan.

Any Claim against the Debtor (except a Claim that would give rise to a deduction if paid) that is discharged by payment to a Creditor of Cash and/or property will result in the creation of a Debt Discharge Amount reducing tax attributes to the extent that the adjusted issue price of the debt discharged (plus accrued interest) exceeds the fair market value of the payment made in cancellation thereof.

A Debtor's Debt Discharge Amount may be increased to the extent that a person holding unscheduled Claims fails to timely file a proof of claim and has his claim discharged on the Confirmation Date pursuant to Bankruptcy Code Section 1141.

**17.3**    **Tax Consequences To Creditors.**  A Holder of a Claim who receives a Distribution on the account of such Claim that is less than the Holder's adjusted basis in such Claim may be entitled to claim a bad debt deduction for this difference.  A bad debt deduction is

52

allowed in the taxable year of the Creditor in which a debt becomes wholly worthless. The discharge of a Claim pursuant to the Plan establishes that such Claim is wholly worthless as of the date of discharge (assuming the Holder of the Claim receives no consideration under the Plan with respect to such Claim). It is possible, however, that such Claim may have become wholly worthless on an earlier date, depending upon all the facts and circumstances. The Debtor expresses no opinion regarding the date or dates on which Claims discharged under the Plan become worthless.

**XVIII.**

**<u>MISCELLANEOUS</u>**

    **18.1**    **<u>Discharge of Debtor and Injunction</u>.** The rights afforded in the Plan and the treatment of all Claims therein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtor or any of its assets or properties.

    **18.2**    **<u>Headings</u>.** The headings used in the Disclosure Statement and in the Plan are inserted for convenience only and neither constitutes a portion of the Disclosure Statement or the Plan nor in any manner affect the construction of the provisions of the Disclosure Statement or the Plan.

    **18.3**    **<u>Notices</u>.** All notices and requests in connection with the Disclosure Statement and the Plan shall be in writing and shall be hand delivered or sent by mail, facsimile or email addressed to:

> Garrick A. Hollander, Esq.
> Winthrop Couchot Golubow Hollander, LLP
> 660 Newport Center Drive, Suite 400
> Newport Beach, CA 92660
> Facsimile: (949) 720-4111
> Email: ghollander@wcghlaw.com

    All notices and requests to any Person holding of record any Claim or Interest shall be sent to them at their last known address or to the last known address of their attorney of record. Any such Person may designate in writing any other address for purposes of this Section, which designation will be effective on receipt.

53

1    **18.4    <u>Inconsistencies.</u>**  In the event the terms or provisions of the Disclosure Statement

2    are inconsistent with the terms and provisions of the Plan or documents executed in connection

3    with the Plan, the terms of the Plan shall control.

4    Date:  December 22, 2017                    **XS RANCH FUND VI, L.P.,**
                                                 a Delaware limited partnership
5

6

7    By:_____
                                                     Michael VanderLey
8    Its:    Chief Restructuring Officer

9    **SUBMITTED BY:**
     **WINTHROP COUCHOT**
10   **GOLUBOW HOLLANDER, LLP**

11   By:___*/s/ Garrick A. Hollander*___
12            Garrick A. Hollander
     General Insolvency Counsel to
13   the Debtor and Debtor-in-Possession

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

54

XS Ranch Disclosure Statement