

The following constitutes the Memorandum Decision of
the Court.  Signed: March 28, 2019

Roger L. Efremsky
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

In re:

XS RANCH FUND VI, L.P.,

           Debtor.

)
)
)
)
)
)
)
)
)

Case No. 16-31367 - RLE

Chapter 11

### MEMORANDUM DECISION REGARDING
### DEBTOR'S OBJECTION TO CLAIM OF MELTING POINT SOLUTIONS, INC.

## I. Introduction

Debtor XS Ranch Fund VI, L.P. ("Debtor") commenced this contested matter by filing an objection to the proof of claim no. 73-1 filed by Melting Point Solutions, LLC ("Melting Point" and the "Claim"). The Claim seeks payment of two percent of the $18.6 million in debtor-in-possession financing Crestline Direct Finance, L.P. ("Crestline") provided to Debtor.

In December 2018, the court held a trial. These are the

-1-

court's findings of fact and conclusions of law. For the reasons explained below, the court now rules that the Claim shall be allowed in its entirety, and shall include reasonable attorney's fees, expenses and interest.[1]

## II. Facts

The material facts are largely undisputed. The parties are familiar with the factual background regarding this dispute and the following is a brief review to provide context.

### A. Background and Events Leading to Bankruptcy

Debtor is a Delaware limited partnership formed in 2006 to invest in raw land that had received approvals for development. Debtor owns approximately 8,700 acres near Austin, Texas which it intends to develop into residential housing along with related infrastructure including a bridge over the Colorado River. *Dkt. No. 383* (Disclosure Statement, 24-25).

XS Ranch VI Manager, L.P., a Delaware limited partnership, is Debtor's general partner (the "General Partner"). Coast Range Investments, LLC ("Coast Range") is the general partner of the General Partner.

James P. Foster described himself as the general partner, the managing partner, or the managing member of Coast Range. *Day One, Foster testimony, 134:6-13.*[2] Foster testified that he had only one partner in Coast Range who owned an eleven percent

---

[1] Melting Point also filed an amended proof of claim (No. 73-2). Based on the court's findings herein, consideration of the equitable theories asserted in Claim No. 73-2 is unnecessary.

[2] The transcript of the trial is at *Dkt. No. 554* (Day One) and *Dkt. No. 558* (Day Two). All references to the trial testimony are to these two docket entries.

-2-

interest. *Day One, Foster testimony, 162-163.* Foster also testified that Coast Range owned more than fifty percent of the General Partner in which there were four other partners. While his testimony was less than precise, it is clear that Foster controlled the General Partner and Coast Range, and thus ultimately controlled Debtor. By his own admission, at relevant times, he was the only individual who had authority to sign a contract on behalf of Debtor, Coast Range, or the General Partner. *Day One, Foster testimony, 148:20-149:2.* He was the lead actor in most of the events that matter here.

In February 2015, certain of Debtor's limited partners initiated a JAMS arbitration proceeding against Debtor, the General Partner, Coast Range, and Foster in which they alleged wrongdoing and by which they sought the return of their investment of approximately $28 million. *Dkt. No. 383* (Disclosure Statement, 29-30). In April 2015, Debtor, the General Partner, and Coast Range asserted counterclaims in the arbitration. *Ex. J* (Settlement Agreement).

Following trial in the arbitration, in July 2016, Debtor, the General Partner, Foster and Coast Range entered into a settlement agreement with the limited partners pursuant to which Debtor had until December 2016 to pay them roughly $28.5 million in order to accomplish the rescission of their limited partnership interests. *Ex. J.* When Debtor was unable to make this payment, the Texas state court entered a judgment in favor of the limited partners. Three of these limited partners - acting as the petitioning creditors - filed an involuntary chapter 7 bankruptcy case as to Debtor on December 23, 2016. *Dkt. No. 1.*

-3-

### B. Events During the Bankruptcy Case

Debtor first tried to have the involuntary case dismissed. *Dkt. No.* 7 (Motion to Dismiss). When this failed, on March 13, 2017, Debtor filed an answer contesting the involuntary petition. *Dkt. No. 18.* The court then set a May 31, 2017 trial date. *Dkt. No. 21.* However, on May 9, 2017, Debtor filed a stipulation with the petitioning creditors providing that Debtor would file a voluntary chapter 11 case on or before May 31, 2017. *Dkt. No. 3*7. Accordingly, effective June 1, 2017, the involuntary chapter 7 case was converted to a chapter 11 case. *Dkt. No. 59.*

In April 2017, Debtor hired Force 10 Partners LLC ("ForceTen") to provide Michael VanderLey as its chief restructuring officer. *Ex. O, Ex. P* (Application to Employ and supporting VanderLey Declaration, attaching 4/15/17 Engagement Agreement with ForceTen). On June 2, 2017, Debtor filed its application to employ ForceTen, and in September 2017 the court entered an order approving this employment on revised terms. *Dkt. No. 202* (Order Approving Employment)*.*

On June 30, 2017, Debtor filed a motion seeking approval of debtor-in-possession financing from Crestline. *Dkt. Nos. 86-92.* In September 2017, the court entered an order authorizing Debtor to borrow $18.6 million from Crestline (the "DIP Financing"). *Dkt. No. 200.*

In March 2018, the court entered an order confirming Debtor's Second Amended Chapter 11 Plan of Reorganization (the "Plan"). *Dkt. Nos. 437, 442.* Upon confirmation, Crestline also provided Debtor $35 million in exit financing (the "Exit

Financing"). *Dkt. No. 437.[3]*

**C. Events Regarding Debtor and Melting Point**

**1. Background Regarding Melting Point**

In early 2015, Raphael Haas formed Melting Point and is its chief executive officer. *Day One, Haas testimony, 22.* Melting Point's website says it provides a "process-driven approach to selling illiquid interests" and provides a "secondary market platform" which allows a "transparent and effective way to buy and sell limited partnership interests." *Ex. 1* (excerpt of Melting Point website).

Haas testified that Melting Point is "hired by an institution to help an investor sell illiquid alternative assets. Those illiquid alternative assets typically take the form of a limited partnership interest in a fund ... we are hired to create a competitive auction environment in order to elicit the highest price in the market." *Day Two, Haas testimony, 41:18-42:2.* He also explained that Melting Point's business includes a "GP restructuring component" which may involve the injection of fresh capital into a fund. *Day One, Haas testimony, 12:10-17.* Melting Point's process involves putting together a data room, hosting diligence calls with general partners, and collating primary documents given to it by issuers or by its clients. Melting Point does not provide investment advice or negotiate terms; it simply "runs a process." *Day Two, Haas testimony, 41:12-43:3.*

In December 2014, Haas was introduced to Foster and, at some

---

[3] The Plan states the Exit Financing was $30 million. Foster stated that it was $35 million. *Day One, Foster testimony, 159:1-2.*

Case: 16-31367   Doc# 566   Filed: 03/28/19   Entered: 04/01/19 11:58:19   Page 5 of 41

point thereafter, Melting Point began sharing office space in San Francisco with Foster and Coast Range. *Day One, Foster testimony, 135-136*. In effect, Foster (or one of the entities he controlled) was Melting Point's landlord. Foster sat in an office adjacent to Haas. *Day One, Foster testimony, 137-138*.

## 2. The Agreement with Melting Point

On March 23, 2015, Coast Range - through Foster - and Melting Point and Kidron Capital Advisors LLC entered into the Intermediary Services Agreement (the "Agreement") which forms the basis for Melting Point's Claim. *Ex. B*.

The first paragraph of the Agreement says it is

> by and between Coast Range Investments (the "Seller"), in its capacity as the seller of certain securities or other interests (the "Assets"), and Kidron Capital Advisors LLC (member FINRA, SIPC) (the "Intermediary"), which has been introduced to the Seller by Melting Point.

The first *whereas* paragraph states that Seller wishes to appoint Intermediary to -

> [A]ssist in identifying and facilitating the sale of certain Assets which may include interests in private equity funds, hedge funds, a fund of hedge funds, venture capital funds, and such funds' underlying assets or other illiquid assets (the "Services"), in one or more transactions (each a "Purchase").

The third *whereas* paragraph states that Intermediary has a contractual relationship with Melting Point which maintains a "platform that provides trading-related services in connection with alternative investments."

The "Scope of the Engagement" provides that Intermediary is the Seller's exclusive sales agent to perform the Services and to assist Seller in a sale of the Assets in a non-public sale of securities. *Ex. B, ¶2*.

-6-

The provision for the "Intermediary's Fee" states that, for each purchase, simultaneously with the consummation of a sale, Seller will pay Intermediary "a commission of two percent (2%) of the Nominal Face Value" of the Assets as compensation for performing these services and facilitating a purchase. *Ex. B, ¶5.* The Agreement also provides that Seller will reimburse Melting Point's reasonable expenses. *Ex. B, ¶8.*

Paragraph 14 provides that the Agreement "may be amended with the written consent of the parties hereto." Paragraph 17 is an integration clause. Paragraph 18 contains the Seller's representations and warranties. These include that Seller has (1) authority to perform its obligations under the Agreement; (2) has valid and marketable title to the Assets; and (3) is the legal and beneficial owner of the Assets free and clear of adverse claims. These representations are explicitly made "subject in all cases to the restrictions on transfer of shares contained in the bylaws of the issuer of the Assets ("Issuer") and "any agreement ... that the Seller has entered into with the Issuer in connection with the Seller's acquisition of the Assets." *Ex. B, ¶18.*[4]

The Agreement had an initial one year term with a tail period of twelve months following this initial term during which the Intermediary was entitled to its fee if a transaction with a defined "Contacted Party" took place. *Ex. B, ¶1, ¶6.* The Agreement includes an attorney's fee clause (¶10) and provides it

---

[4] Haas testified that "Issuer" generally refers to the general partner of the fund that issues the limited partnership interests. *Day One, Haas testimony, 124:1-3.*

-7-

is governed by New York law (¶9).

Haas testified that the Agreement was an "off the shelf" form designed to cover a multitude of transactions. *Day One, Haas testimony, 122:12-124:11*. When the Agreement was signed, Melting Point understood there would be a "plain vanilla" transaction involving the sale of the $28 million in disaffected limited partnership interests in Debtor. According to Haas -

> [W]e were hired by Mr. Foster to help him get liquidity for the three LPs that had wanted to exit the fund ... our understanding was that the fund, through Mr. Foster, was going to actually facilitate the transaction so when a buyer was brought to the table, that buyer was going to put their purchase price through the fund. Those three LPs would be redeemed, and that new buyer would take their position.

*Day One, Haas testimony, 30:4-14.*

Foster's testimony was consistent with this understanding. *Day One, Foster testimony, 135:23-136:8* ("we were looking for replacement" LPs; the agreement with Melting Point was to assist in the sale of those securities to get these LPs their money back).

### 3. Melting Point's Efforts to Replace Limited Partners

On March 31, 2015, Melting Point sent Foster a list of 35 potential buyers of the limited partnership interests. *Ex. C* (list of potential buyers); *Ex. H* (undated document giving a brief explanation of the status of contacts with potential buyers). In April 2015, Melting Point contacted Crestline. *Ex. D* (4/30/15-5/4/15 email chain between Haas and Crestline attaching information about Debtor, asking if Crestline were interested in a "real estate secondary" for an "entitled land transaction in Austin," explaining that the client is "the GP who is coordinating the sale of $27m from three of his LPs").

-8-

In June 2015, Melting Point forwarded Foster an offer from one potential buyer of limited partnership interests. *Ex. F* (offer of 72% of net asset value from Strategic Partners Fund Solutions). Haas testified that this sale was not consummated because Foster was unable to reach an agreement with the rescinding limited partners. *Day Two, Haas testimony, 53:4-10; 54:15-19.* According to Haas, this was the only "plain vanilla" offer that was presented. *Day Two, Haas testimony, 55:12-13.*

### 4. Foster Expands the Scope of the Agreement

Soon after signing the Agreement, Melting Point came to understand that a straightforward transaction involving sale of limited partnership interests would be impossible due to the pending litigation with the disenchanted limited partners and with certain former partners of Coast Range. *Day One, Haas testimony, 30:18-31:5; Day Two, Haas testimony, 47:4-18; 55:8-21.* Nonetheless, Foster encouraged Melting Point to "help find liquidity for the fund, broadly defined." *Day One, Haas testimony, 34:9-12.* This "could be a straight loan. It could be another class of shares. It could be preferred security, some fund level transaction that would put additional liquidity in the fund, that the GP of the fund could use either to redeem the LPs that needed or wanted to get out. It could be used for other fund purposes." *Day One, Haas testimony, 35:5-23.* Haas explained –

> many of the buyers that we work with do different forms of financing. The asset was known to them, so the scope expanded. There were groups that were unwilling to purchase an LP interest but were willing to fund liquidity for Foster and XS Ranch to enable the fund to purchase the LP interests or provide other liquidity for the project.

*Day One, Haas testimony, 34:12-18.*

-9-

Foster's testimony was consistent with this. When asked whether, on behalf of Debtor, he authorized Melting Point to pursue financing on behalf of Debtor, he replied that he "authorized the equity piece" and had told Haas he was "open to looking at debt opportunities." *Day One, Foster testimony, 149:15-25.* Foster appears to have been more than "open to looking at debt opportunities." He was, in fact, enthusiastic about the prospect. *Ex. V* (1/4/16 email from Haas to Foster asking if there was "any reason not to reach out" to a San Francisco-based hedge fund "about a possible loan?" Foster immediately replied "Not at all!").

Because they shared office space, Foster and Haas were in day-to-day contact and frequently discussed Debtor's needs and the sources of financing that may have been available. *Day One, Haas testimony, 125:3-20.* They also discussed how Foster - on behalf of Debtor, the General Partner and Coast Range - would respond to the various term sheets Melting Point received and forwarded to Foster. *Day One, Foster testimony, 140:7-17* (explaining that "the process was informal. I would walk into his office or vice-versa").

The documents admitted at trial betray Foster's half-hearted efforts - in his deposition and in his trial testimony - to distance himself from the fact that he encouraged Melting Point to find debt financing for Debtor. The documents show that Foster knew full well what Melting Point was doing, was an active participant in each proposed transaction, and further confirm that his intent was to compensate Melting Point according to the terms of the Agreement if one of these transactions had been

-10-

consummated.

Between June 2015 and September 2016, Melting Point presented Coast Range with several financing proposals for Debtor. In June 2015, Melting Point presented a comprehensive restructuring offer from Origami Capital Partners LLC. *Ex. E* (describing $25 million "recapitalization framework" for investment in XS Ranch or for new investors to acquire assets from XS Ranch, and general goal to provide new capital to fund carry and development costs"). According to Haas, Origami was not interested in purchasing the limited partnership interests but thought there was a "potential path forward to have a broader GP level arrangement." *Day Two, Haas testimony, 51:10-21*. Because Foster told Haas he was open to the idea, Origami developed its proposal for a "fund recapitalization." This proposal was not consummated because, according to Haas, "on further diligence and meetings with the GP and his team, [Origami] did not think that their investment would be wise." *Day Two, Haas testimony, 51:22-52:23.*

In July 2015, Melting Point presented Foster with a term sheet from IMH Financial Corporation for a possible $15 million loan to Debtor. *Ex. G* (8/10/15 email chain between Haas, Foster and IMH which attaches the IMH response to Coast Range's counter LOI); *Ex. 20* (7/31/15 email from Haas to IMH attaching Coast Range's comments to IMH's 7/6/15 term sheet regarding $15 million loan to Debtor).

Haas testified that IMH was initially approached to purchase the disaffected limited partners' interests but was not interested in that sort of transaction. Instead, IMH asked if

Case: 16-31367   Doc# 566   Filed: 03/28/19   Entered: 04/01/19 11:58:19   Page 11 of 41

Debtor would be open to a loan to be used to refinance existing
senior debt and provide funding for Debtor to construct a bridge.
*Day Two, Haas testimony, 56:4-17.* Haas testified that this
transaction would not have resolved the limited partners' issues
but Foster was receptive and was actively involved in the
discussions with IMH. *Day Two, Haas testimony, 57:4-15; 107:15-23.*

In January 2016, Haas asked Foster if there was any reason
not to reach out to a San Francisco-based hedge fund about a
possible loan. Within a minute, Foster replied "Not at all!" *Ex.
V.*

### 5. Settlement with Limited Partners Brings Clarity

In July 2016, Debtor, the General Partner, and Coast Range
settled the arbitration with the limited partners. *Ex. J.*
Pursuant to this settlement, Debtor had 120 days to raise the
money to pay the limited partners $28.5 million. It is unclear
when Melting Point was informed of the exact terms of this
settlement. However, Haas testified that learning of the
settlement in the summer of 2016, "caused us to redouble our
efforts because what we thought was the overhang went away. There
was clarity to the situation, and that we now could try for a
more holistic solution for the fund which involved the LP
liquidity but also additional capital for the fund." By
"overhang" Haas explained that he meant the litigation with the
limited partners which had to be resolved before anyone "would be
willing to step into their shoes." *Day Two, Haas testimony, 62:2-17.*

In August 2016, Foster signed an extension of the Agreement

-12-

giving it an additional one year term. *Ex. I* (8/23/16 letter signed by Foster as managing member of Coast Range).[5] Haas testified that the scope of the services in the Agreement was not changed in this August extension because he believed "the broad nature of the services in the existing Agreement covered the work" and "we were doing it day-to-day, hand-in-hand with the GP." *Day Two, Haas testimony, 63:5-9*. The fact that Melting Point had presented Foster with a number of offers for debt financing for Debtor before this was signed confirms this understanding.

In September 2016, Melting Point introduced Fortress Credit Corporation which proposed making Debtor a $65 million delayed draw term loan. *Ex. K* (9/22/16-9/23/16 email chain attaching Mr. Foster's proposed use of funds from this loan including a 2% fee to Melting Point); *Ex. L* (11/30/16 Fortress letter to Coast Range with non-binding term sheet outlining proposed terms and conditions for a $65 million loan to Debtor). This term sheet allocated up to $28.5 million for the interests of the limited partners and provided funds to develop the project. Like the previous expressions of interest, this one also failed. Haas testified that "Fortress did not believe that the fund management team could achieve the objectives outlined in what they said they could do." *Day Two, Haas testimony, 67:22-68:12*.

### 6. Melting Point Reintroduces Crestline in 2017

Melting Point had contacted Crestline in 2015 for what was then contemplated to be a sale of limited partnership interests

---

[5] The fact that Foster signed this extension in August 2016 indicates that the parties believed the Agreement was still in effect and Debtor waived any contrary provision of the Agreement.

Case: 16-31367   Doc# 566   Filed: 03/28/19   Entered: 04/01/19 11:58:19   Page 13 of 41

in Debtor. *Ex. D; Day Two, Haas testimony, 50:8-15.* At trial, Foster acknowledged that Melting Point introduced Crestline. *Day One, Foster testimony, 158:8-9.* By the definition in the Agreement, Crestline was then a Contacted Party. *Ex. B, ¶3.*

By the spring of 2017, Foster was willing to consider a general partner restructuring or replacement. *Day One, Haas testimony, 100:15-25.* At this point, Melting Point again reached out to Crestline for this sort of transaction. *Day Two, Haas testimony, 68:14-69:13.*

The parties then negotiated a non-disclosure agreement and Crestline began its due diligence. *Ex. 30* (4/25/17-5/1/17 email chain between Melting Point and Crestline). Haas testified that he believed Crestline was interested in providing financing for a general partner restructuring that would allow Debtor to extricate itself from bankruptcy. This proved impossible due to timing constraints for both Debtor and Crestline. The transaction then began to take the shape of the DIP Financing. *Day One, Haas testimony, 102:14-17; Exs. 33-35.*

Between May 1, 2017 and May 31, 2017, there were site visits, multiple conference calls and meetings at which Crestline's eventual role in this case took shape.[6] On May 31, 2017, Crestline sent Melting Point its term sheet for $32 million in debtor-in-possession financing. *Ex. 3* (Ex. C to Claim). Melting Point delivered this to Debtor.

*//*

---

[6] See *Exs. 37, 40, 41, 44* and the proofs of claim filed by Debtor's counsel (Claim No. 30) and ForceTen (Claim No. 32) for work they performed during the gap period April - May 2017.

-14-

### 7. Efforts to Obtain a Signature on Amended Agreement

For some time, Melting Point had tried to obtain Foster's signature on an amendment to the Agreement. *Ex. 6* (6/23/17 email from Haas to Foster sending "the engagement extension I asked you to put in place starting in *February* ... you told me you would sign this when you were back in the office last month but I don't find a signature page ... As you know, the most efficient way for Melting Point to be paid is by the estate, and out of use of proceeds rather than through Coast Range"); *Ex. N* (5/16/17 and 5/31/17 emails from Haas to Foster attaching the proposed amendment).

The proposed amendment expanded the definitions in the Agreement to cover the "sale of certain designated Assets, which may include interests in real estate funds and such funds' underlying assets or other illiquid assets, or any investment in Seller of any equity or debt securities, in one or more transactions." It also sought to extend the term of the Agreement to its third anniversary (*i.e.*, March 2018) and to extend the tail period so that Melting Point would be entitled to its two percent fee in the event that "Seller (or any affiliate or successor of Seller) consummates a Purchase with any Contacted Party."

Haas testified that these proposed changes to the Agreement were intended to make it reflect what the parties had been doing since 2015 when it became clear that the sale of the limited partnership interests was not possible. *Day Two, Haas testimony, 78:5-13*. He also testified that during the time he was trying to get Foster to sign it, Foster never told him that he *couldn't*

-15-

sign it. It was only after the Claim was filed that Foster apologized, saying he wasn't sure he had the *authority* to sign it. *Day Two, Haas testimony, 79:7-14.*

Foster's testimony was consistent with this. He did not disagree with the proposed revised agreement in principle but he did not sign it because he was unclear as to whether he had authority at the point in time because VanderLey was then the CRO. *Day One, Foster testimony, 159:6-160:9.*

## 8. Events Leading Up to the DIP Financing

As the negotiations with Crestline continued, the issue of Melting Point's continued role and its fee took on greater urgency. On May 23, 2017, Haas let Crestline know it was concerned about protecting Melting Point's fee. *Ex. 38.* On May 31, Haas advised Crestline that Coast Range had agreed to a five percent aggregate fee to be split between Melting Point (two percent) and ForceTen (three percent). *Ex. 40.*

The case was converted to chapter 11 on June 1, 2017; on June 2, ForceTen's employment application was filed showing it expected a five percent fee on any debtor-in-possession financing. *Ex. P.* VanderLey was aware of Melting Point's concerns, discussed the issue with Haas, and led Haas to believe that Melting Point would be compensated through a fee sharing arrangement with ForceTen. *Ex. Q* (6/6/17 email from VanderLey to Haas regarding Melting Point's fee - "I have some thoughts on the subject I believe you will find constructive."); *Ex. S* (6/8/17 email from Haas to VanderLey "we agree with your approach"); *Day Two, Haas testimony, 80:16-25* (describing VanderLey suggestion for a fee sharing agreement between Kidron, Melting Point and

-16-

1  ForceTen).[7]

2      Despite making the suggestion of a fee sharing arrangement

3  and initially offering to draft it, VanderLey had backed away

4  from this concept by June 14, 2017 at which point he had learned

5  that Crestline would not agree to a five percent fee for ForceTen

6  *plus* a two percent fee for Melting Point. *Ex. S* (6/14/17 email

7  from VanderLey to Haas noting that Crestline proposed a

8  "significantly scaled back capital raise fee (less than 2% of the

9  total proposed DIP financing amount)").

10     On June 6, 2017, VanderLey advised Haas that Haas had to

11 stop participating in any of the calls or meetings regarding the

12 transaction with Crestline. *Ex. Q* (6/6/17 email from VanderLey to

13 Haas informing him that he was not authorized to speak on

14 Debtor's behalf). At some point, Foster told Haas to file a proof

15 of claim which Melting Point did. *Day Two, Haas testimony, 84:23-*

16 *85:5.*

17 **III. Discussion**

18     **A. The Parties' Arguments**

19     Debtor contends that Melting Point's Claim must be

20 disallowed because (1) Debtor is not a party to the Agreement;

21 (2) the Agreement provides only for payment upon the closing of a

22 sale of securities or other interests owned by a non-debtor party

23 and this did not take place; (3) the New York statute of frauds

24 precludes recovery; and (4) if California law applies, its real

25 estate brokers' licensing rules preclude recovery.

26

27      [7]At trial, VanderLey claimed not to have made this fee

28 sharing suggestion. *Day Two, VanderLey testimony, 30:24-32:3.*

-17-

Melting Point disputes each of these contentions. Melting Point argues that the Agreement should be interpreted to find that Debtor is a party to it and it covers the debt financing that occurred here. Alternatively, Melting Point urges the court to find that the Agreement was orally modified and fully performed which makes the New York statute of frauds irrelevant, or that Debtor is estopped from using the statute of frauds as a defense. Finally, if the court finds that the Agreement does not apply, Melting Point contends it is entitled to recover its fee under various equitable theories using California law.

**B. Claim Allowance and the Burden of Proof**

Bankruptcy Code §502(a) provides that a claim, proof of which is filed under §501, is deemed allowed unless a party in interest objects. Bankruptcy Rule 3001 governs the form and content of a proof of claim. Under Bankruptcy Rule 3001(f), a proof of claim executed and filed in accordance with these rules constitutes prima facie evidence of the validity and amount of the claim. Melting Point's Claim is entitled to this presumption of validity.

Bankruptcy Code §502(b) provides that if an objection is made, the court shall determine the amount of the claim and allow it as of the petition date except to the extent that the claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured. Bankruptcy Code §502(b)(1).

Claims enforceable under state law are allowed in bankruptcy unless expressly disallowed. <u>Travelers Cas. and Sur. Co. of Am.</u>

-18-

v. Pac. Gas & Elec. Co., 549 U.S. 443 (2007). The grounds stated in Bankruptcy Code §502(b)(1)-(9) are the exclusive grounds for the disallowance of claims. Heath v. Am. Express Travel Related Servs. Co. (In re Heath), 331 B.R. 424 (9th Cir. BAP 2005). The only relevant provision here is Bankruptcy Code §502(b)(1).

To overcome the Rule 3001(f) presumption of validity, the objecting party must present evidence with probative force equal to that of the claim. Lundell v. Anchor Constr. Specialists, Inc., 223 F.3d 1035, 1039 (9th Cir. 2000). In short, the objecting party's task is to produce credible evidence to refute at least one of the allegations essential to the claim's legal sufficiency. Id. at 1040. If the objecting party rebuts the presumption of validity, the claimant then bears the burden of proof by a preponderance of the evidence that its claim is valid; the ultimate burden of persuasion remains at all times upon the claimant. Id. at 1039. See also In re Spiegel, Inc., 2007 WL 2456626, *15 (Bankr. S.D.N.Y. Aug. 22, 2007 (citing In re Allegheny Int'l, Inc., 954 F.2d 167, 173-74 (3d Cir. 1992).

### C. Witnesses at Trial and their Credibility

Foster and VanderLey testified for Debtor and Haas testified for Melting Point.[8] Haas's testimony was consistent and credible. The same cannot be said of Foster or VanderLey.

Foster was not a persuasive witness. His trial testimony contradicted his deposition testimony, and both of these were contradicted by extrinsic evidence consisting of documents he

---

[8] Debtor also called Ginn Willow Downing to testify regarding what a typical finder's fee might be. This testimony was largely irrelevant.

-19-

prepared or authorized. At trial, he testified that, as the
ultimate general partner of Debtor, he authorized Melting Point
to seek financing for the "equity piece" but had told Haas "I was
open to looking at debt opportunities." *Day One, Foster
testimony, 149:22-25*. In his deposition, Foster was asked whether
he personally asked Haas to search for financing. He answered
"no." He was then asked whether he had done so in his capacity as
managing partner of Coast Range. His response was "I don't know."
*Day One, Foster testimony, 151:1-152:20.* He had no valid
explanation for this discrepancy and the trial evidence showed he
knew that Melting Point was presenting debt financing proposals
for *Debtor* and he intended that Melting Point would be
compensated at two percent of any funds raised as a result of one
of these transactions. *Ex. G* (IMH term sheet for $15 million
loan); *Ex. K* (Fortress use of funds; two percent of $16 million
and two percent of $28.5 million to Melting Point); *Ex. L* (term
sheet for Fortress $65 million term loan); *Ex. V* (approval for
Melting Point to reach out to lender White Oak); *Day One, Foster
testimony, 157:13-25.* He also claimed to recall speaking to Haas
about debtor-in-possession financing but could recall nothing
that Haas contributed to the substance of these conversations.
*Day One, Foster testimony, 143:13-144:19.*

VanderLey was not a persuasive witness. His testimony seemed
calculated, self-interested, conveniently vague, and, at times,
intentionally evasive. For example, he claimed that because Haas
was present at one or two meetings with Crestline and others,
Haas was necessarily a "participant" in the "negotiation" of the
DIP Financing. *Day One, VanderLey testimony, 214:11-23; Day Two,*

*VanderLey testimony, 8:1-9* (Haas "was comporting himself in a
manner that I found consistent with brokers, investment
bankers..."). When he was asked what Haas had said, VanderLey
retreated to generalities such as "we discussed a variety of
potential business elements of the transaction" and "he was
there." *Day Two, VanderLey testimony, 22:17-23:14.* As previously
noted, he also disclaimed having told Melting Point that he would
draft a fee sharing agreement when contemporaneous correspondence
indicates he had suggested this. This greatly diminished his
credibility.[9]

### D. Contract Interpretation under New York Law

The Agreement states that it is governed by New York law.
Under New York law, formation of a contract requires an offer,
acceptance, consideration, mutual assent, and intent to be bound.
Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 427 (2d Cir.
2004). To succeed on a breach of contract theory, a party must
show the existence of a contract, adequate performance of it,
breach by the other party, and damages suffered as a result.
Nickel v. Brenton, LLC, 92 F. Supp. 3d 38 (N.D.N.Y. 2015).

A contract is to be enforced as the parties made and
understood it unless some statutory provision requires the court
to give it a different construction which the parties never
intended. Hopkins v. Connecticut General Life Ins. Co., 225 N.Y.
76 (1918). A court may look beyond the form into which the
parties cast their agreement; the spirit and purpose of an

---

[9] Such a sharing arrangement may not have been permissible
under Bankruptcy Code §504.

-21-

agreement as well as its letter must be used in its interpretation and application. Wm. C. Atwater & Co. v. Panama R. Co., 246 N.Y. 519, 524 (1928) (interpretation requires consideration of surrounding circumstances and parties' apparent purpose). It is a cardinal principle for construction and interpretation of contracts in New York that the intention of the parties controls. SR Int'l Bus. Ins. Co. v. World Ctr. Props., LLC, 467 F.3d 107, 125 (2d Cir. 2006) (citing Newmont Mines, Ltd. v. Hanover Ins. Co., 784 F.2d 127, 135 (2d Cir. 1986).

Under general principles of contract law, a failure to locate explicit contractual language does not mark the end of proper judicial interpretation and construction; contracting parties often express their agreements imprecisely or incompletely. In such cases, if the interpreting court can discern from the contract as a whole what the parties must have intended, it should enforce that intention despite a lack of express terminology. Dobson v. Hartford Fin. Servs. Grp., Inc., 389 F.3d 386, 399 (2d Cir. 2004). However, a court cannot make a new contract for the parties under the guise of interpreting their writing. Reiss v. Fin. Perf. Corp., 97 N.Y. 2d 195 (2001). A court is to discern the intent of the parties but is not to add or delete terms into their contract. Skanska USA Bldg. Inc. v. Atlantic Yards B2 Owner, LLC, 31 N.Y. 3d 1002, 1006 (2018).

The construction of an unambiguous contract is a legal question for the court and circumstances extrinsic to the agreement will not be considered when the intention of the parties can be gathered from the instrument itself. Sugerman v. MCY Music World, Inc., 158 F. Supp. 2d 316, 323 (S.D.N.Y. 2001).

-22-

Contractual language is unambiguous when it has a definite and precise meaning such that there is no reasonable basis for a difference of opinion. <u>Id.</u> Where the language is ambiguous or equivocal, the parties may submit parol evidence concerning the facts and circumstances surrounding the making of the agreement. <u>Id.</u>

Where the parties to a contract with ambiguous terms engage in a uniform course of conduct from which its practical meaning may be understood, a court will treat it as having that meaning even though it might have been given a different meaning as an original proposition. <u>Continental Cas. Co. v. Rapid-American Corp.</u>, 80 N.Y. 2d 640, 651 (1993) (practical construction of doubtful provision will be given where there is conduct by party claiming under it coupled with knowledge and acquiescence by the other party).

**E. Application**

Under the above definition of an ambiguous contract, the court finds that the Agreement is ambiguous and parol evidence is admissible to discern its intended meaning.

**1. The Parties to the Agreement and its Coverage**

The first paragraph of the Agreement says it is between Coast Range as Seller and Kidron as Intermediary, and Seller is appointing Intermediary to assist in identifying and facilitating the sale of certain Assets which may include "interests in private equity funds, hedge funds, a fund of hedge funds, venture capital funds, and such funds' underlying assets or other illiquid assets." The Seller represented and warranted that it had the authority to perform and was the legal and beneficial

-23-

owner of the Assets free and clear of adverse claims. These representations were explicitly made subject to the restrictions on transfer of shares contained in the bylaws of the Issuer."

The Agreement was signed by a representative of Kidron, by Haas for Melting Point, and by Foster in the signature block intended for the Seller. However, the part of the signature block for the name of the Seller to be inserted was left blank as was the line reading "Accepted and agreed to this   day of   ." Foster testified that he was the only individual authorized to sign a contract on behalf of Debtor, its General Partner, or Coast Range. There is no challenge to his authority to sign the Agreement on behalf of any of these entities.[10]

There was no schedule of the Assets to be sold but they are described in the widest possible terms to include various funds and "such funds' underlying assets or other illiquid assets." This phrase is broad enough to describe the interests of the limited partners in Debtor. Foster and Haas were clear that arranging to repay the disaffected limited partners was the initial goal for which Melting Point was engaged. According to Haas, if this sort of simple transaction had been possible, Melting Point would have used its platform to facilitate the transfer of $28 million to those limited partners seeking an exit and their replacement with new owners of their limited partner interests. As it turned out, pending litigation made this sort of transaction impossible at a price acceptable to these limited partners and presumably to Foster. Foster and Haas were also

---

[10] See Del. Code Ann. tit. 6, §17-403(a); id. §15-301(1).

-24-

clear that within months of signing the Agreement, this initial goal was broadened to include debt financing for Debtor.

While Coast Range controlled Debtor as Debtor's ultimate general partner, Coast Range was not the legal or beneficial owner of the limited partnership interests in Debtor. However, Coast Range had the authority to transfer - or arrange for the transfer of - these "underlying assets or other illiquid assets." Paragraph 18 indicates that the Agreement was intended to cover a sale of interests issued by an entity other than Coast Range. Logically, this would have included the "other illiquid assets" - the limited partnership interests in Debtor which sale only its General Partner or Coast Range could accomplish.

From the start, the language of the Agreement did not precisely describe what Foster sought to accomplish on Debtor's behalf. But the parties' conduct informs this language and supports the interpretation that they mutually intended a variety of potential transactions involving Debtor to be covered by the Agreement. As discussed above, Melting Point obtained at least one offer to purchase the limited partnership interests and was then encouraged by Foster to broaden the net to include debt financing.

The contrary conclusion now urged by Debtor is contradicted by the overwhelming amount of evidence offered at trial all of which was confirmed by Foster's testimony and by documents he prepared or authorized. In addition, Foster's refusal to sign an amendment to the Agreement because of *Debtor's* bankruptcy case is further confirmation that he understood Debtor was a party to it.

Debtor's stilted interpretation of the Agreement diverges

-25-

from the uncontradicted facts established at trial and the court rejects it. The doubtful provisions of the Agreement will be given the practical construction urged by Melting Point. There was consistent conduct by Melting Point coupled with Debtor's knowledge and acquiescence in that course of conduct. <u>Continental Cas. Co. v. Rapid-American Corp.</u>, 80 N.Y. 2d 640, 651 (1993). Accordingly, the court will give the Agreement the practical construction that Foster and Haas gave it over the two year period involved here.

### 2. The New York Statute of Frauds

Debtor argues that the Agreement provides that Coast Range is the Seller of certain securities and Melting Point's fee is only earned upon a closing of such a sale.[11] From this starting point, Debtor argues that the New York statute of frauds precludes enforcement of any oral agreement involving payment for negotiating a loan and precludes enforcement of any oral modification of the Agreement.

Melting Point counters that the statute of frauds does not preclude its recovery because (1) the Agreement may be interpreted to cover what transpired here so the statute of frauds does not apply; (2) Debtor is estopped from raising the statute of frauds; or (3) the Agreement was orally modified to cover any infusion of cash into Debtor and, as so modified, it

---

[11] Debtor's phrasing of this argument varies: the fee was earned only if securities "held by Coast Range" were sold; the fee was not earned because Melting Point never found a "buyer of limited partnership interests for which it was contracted." It is unclear what "held by" Coast Range means and the Agreement has no such limitation.

-26-

was fully performed and this satisfies the statute of frauds.

The statute of frauds was designed to guard against the peril of perjury, and to prevent the enforcement of unfounded fraudulent claims. But it was not enacted to provide a means of evading just obligations or to supply a cloak of immunity to hedging litigants lacking integrity. <u>Morris Cohon & Co. v. Russell</u>, 23 N.Y. 2d 569, 574 (1969); <u>see also</u>, <u>Imperator Realty Co. v. Tull</u>, 228 N.Y. 447, 457 (1920) (Cardozo, J., concurring) (as to a bar to plead the statute of frauds, "we are facing a principle more nearly ultimate than either waiver or estoppel, one with roots in the yet larger principle that no one shall be permitted to found any claim upon his own inequity or take advantage of his own wrongs").

There are two provisions of the New York statute of frauds relevant to the parties' dispute. There are two questions raised as to each one: does it apply, and if so, is it satisfied. The court concludes that neither of these provisions supports Debtor's preferred outcome here.

### a. Services Rendered in Negotiating a Loan

New York's General Obligations Law §5-701 provides in relevant part:

> (a) Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:
>
> ***
>
> (10) is a contract to pay compensation for services rendered in negotiating a loan.

N.Y. Gen. Obl. Law §5-701(a)(10).

The statutory definition of "negotiating" includes:

-27-

> procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction. This provision shall apply to a contract implied in fact or in law to pay reasonable compensation...

N.Y. Gen. Obl. Law §5-701(a)(10).

What Melting Point did comes within this statutory definition of negotiating a loan for purposes of this New York law - it introduced Crestline to Debtor. However, as previously discussed, the court interprets the Agreement such that it is a sufficient writing to satisfy the statute of frauds: as a matter of mutual intent, Debtor was a party to it and it is clear that the agreed upon performance included finding any kind of capital infusion for Debtor upon which Melting Point earned its fee. As such, the statute of frauds is satisfied.

In the alternative, there is sufficient written evidence aside from the Agreement to satisfy the requirements of §5-701(a)(10). The requirement of some written note or memorandum subscribed by the party to be charged or his lawful agent may be met by piecing together other related writings. Nickel v. Brenton, LLC, 92 F. Supp. 3d 38, 50 (N.D.N.Y. 2015) (court may look to documents relevant to the negotiation and sale of a business opportunity; contract, bids, emails were sufficiently definite to satisfy the statute of frauds).

In TrueForge Global Machinery Corp. v. Viraj Group, 923 N.Y.S.2d 146 (2011), defendant sought dismissal of a complaint based on a §5-701(a)(10) defense. On appeal, the court held that the trial court was correct in denying dismissal. The defense

Case: 16-31367   Doc# 566   Filed: 03/28/19   Entered: 04/01/19 11:58:19   Page 28 of 41

failed because certain email correspondence was sufficient[12] to set forth an objective standard for determining the compensation to be paid to plaintiff as a finder's fee since it was tied to an extrinsic event - a percentage of the price paid for a located acquisition opportunity. The court explained that "a memorandum sufficient to meet the requirements of the statute of frauds must contain expressly or by reasonable implication all the material terms of the agreement, including the rate of compensation if there has been agreement on that matter." Id. at 147. A sufficient memorandum need only evidence the fact of plaintiff's employment by defendant to render the alleged services. The obligation to pay reasonable compensation is then implied. Id. See also Shapiro v. Dictaphone Corp., 411 N.Y.S. 2d 669, 672 (1978) (affirming trial court's denial of summary judgment on breach of contract cause of action, rejecting statute of fraud defense where documents showed the subject matter of the transaction, plaintiff's role in it, and the fact that plaintiff's services were not gratuitously furnished; defendant (1) was informed in writing that plaintiff expected payment if a deal was consummated; (2) urged plaintiff repeatedly to perform services as a broker while assuring him specifics would be agreed upon later and plaintiff relied on this; (3) acknowledged in a letter that the services were performed).

---

[12] N.Y. Gen. Obl. Law §5-701(b)(4); RCC Ventures, LLC v. American DG Energy, Inc., 2018 WL 1415219, *4 (S.D.N.Y. Mar. 19, 2018) (explaining that emails constitute signed writings because the name at the end signifies intent to authenticate contents; emails are sufficient to amend terms of contract when emails expressly state intent to modify and the terms that are modified).

-29-

1     Here, the employment of Melting Point was clear. Its
2 platform was to be used to facilitate a transaction involving
3 raising money to solve Debtor's financial problems. The event
4 that had to occur and the terms of compensation were clear - two
5 percent of the face value of any financing brought into Debtor.
6 Through Foster's conduct, and his written and oral communications
7 with Melting Point, it is also clear that he agreed, on behalf of
8 Debtor, that Melting Point would perform these services as they
9 both understood them and would be compensated for them. In
10 addition, Melting Point did not believe it was performing these
11 services gratuitously and reasonably (and justifiably) relied on
12 Foster's authority to act on behalf of Coast Range, the General
13 Partner, and Debtor.

14     Debtor's objection to the Claim was premised on its
15 contention that there was no contract between it and Melting
16 Point. This theory does not withstand the overwhelming weight of
17 the evidence - from its own witness and its own documents - that
18 soundly disproved it. Debtor's belated attempt to avoid the
19 Agreement, which appears to have been instigated by VanderLey,
20 out of concern for protection of ForceTen's own generous
21 compensation, simply fails.

22     Foster clearly testified that Debtor expected to compensate
23 Melting Point for the proposed debt financing that Melting Point
24 presented, and for its introduction of Crestline. *Day One, Foster*
25 *testimony*, *157:18-25* (if any of these proposals had been
26 accepted, "we would have compensated Melting Point" from the loan
27 proceeds); *159:1-8* (Foster admits he told Haas that Melting Point
28 would be paid for the Crestline introduction). In addition,

-30-

Foster signed the extension of the Agreement in August 2016, and drafted the September 2016 "use of funds" document which also confirmed that Debtor intended to compensate Melting Point. There is no question that Foster - the only individual with authority here - understood and agreed to the objective event that would trigger an obligation to compensate Melting Point: money raised for Debtor. It is also clear that the compensation was to be two percent of any funds so raised to be paid at closing from the loan proceeds.

Assuming only for the sake of argument that the statute of frauds is not satisfied, estoppel to plead the statute of frauds becomes a relevant topic. The elements that will support an estoppel are (1) a clear and unambiguous promise; (2) a reasonable and foreseeable reliance on the promise; (3) performance that is unequivocally referable to the alleged promise; and (4) unconscionable injury as a result of the reliance. Sugerman v. MCY Music World, Inc., 158 F. Supp. 2d 316, 325 (S.D.N.Y. 2001). See also Merex A.G. v. Fairchild Weston Systems, Inc., 810 F. Supp. 1356, 1369 (S.D.N.Y. 1993).

The first three elements are established as the previous discussion shows. As to the fourth, Debtor is correct that the strongly held public policy reflected in New York's statute of frauds would be seriously undermined if a party could be estopped from asserting it every time a court found that some unfairness would otherwise result. Philo Smith & Co. v. USLIFE Corp., 554 F.2d 34, 36 (S.D.N.Y. 1977) (nonperformance of a void agreement does not cause substantial injury).

Under New York law, the use of promissory estoppel has been

-31-

strictly limited to those rare cases where the circumstances render the denial of recovery unconscionable. <u>Sugerman</u>, 158 F. Supp. 2d at 325. Courts have consistently held that the loss of finder's fee, by itself, is not the sort of injury that will defeat the statute of frauds. <u>Id.</u> at 36. Instead, courts look for a high degree of unconscionable behavior on the part of the defendant which makes invocation of the statute of frauds itself a fraud. <u>Merex</u>, 810 F. Supp. at 1373 (citing <u>Philo Smith</u> at 36); <u>see also</u> <u>Imperator Realty Co. v. Tull</u>, 228 N.Y. 447, 457 (1920) (Cardozo, J., concurring, no one shall be permitted to take advantage of his own wrong; statute of frauds was not intended to offer an asylum of escape from this fundamental principle of justice).

The record supports a finding that Debtor must be estopped from raising the statute of frauds as a defense to allowance of the Claim. Melting Point is seeking to be paid for an introduction, *i.e.*, a finder's fee. On some set of facts, the loss of this fee might not rise to the level of injury needed to support an estoppel. But the facts established at trial, with a proper focus on *Debtor's conduct* over more than a two year period, show that refusing to allow the Claim would reward inequitable behavior and inflict unconscionable injury on Melting Point. The "larger principle" that no one should be permitted to take advantage of his own wrongs dictates this result. This is, in fact, the rare case that comes within this narrow exception. Debtor agreed that Melting Point would search for debt financing and Melting Point reasonably and justifiably relied on Foster's repeated assurances that Melting Point would be compensated

-32-

according to the terms of the Agreement if a transaction that infused money into Debtor took place. Melting Point introduced Crestline and the $18.6 million DIP Financing closed. This is a court of equity and allowance of the Claim is the only acceptable outcome here.

### b. Oral Modification

Section 15-301 of New York's General Obligation Law provides:

> A written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent.

N.Y. Gen. Obl. Law §15-301(a).

Paragraph 14 of the Agreement provides that any provision of it "may be amended with the written consent of the parties." This language is permissive rather than mandatory.[13] Debtor argues that this "no oral modification" provision of New York's statute of frauds precludes recovery. In response, Melting Point contends that because §15-301 nullifies only *executory* oral modifications, full or partial performance of an oral modification makes this prohibition irrelevant or estops Debtor from raising it as a defense.

In Rose v. Spa Realty Assoc., 42 N.Y. 2d 338 (1977), buyers of land sued sellers for specific performance of an oral agreement to modify their written sale agreement. The oral

---

[13] This sort of provision may also be waived which appears to have been done here. Rose v. Spa Realty Assoc., 42 N.Y. 2d 338 (1977).

-33-

modification reduced the quantity of land to be sold. The main issue was whether partial performance of the oral modification eliminated the requirement of a writing in §15-301. The court explained that by nullifying executory oral modifications, §15-301 protects the authenticity of any amendment. However, when an oral agreement to modify has in fact been acted upon to completion, the same need to protect the integrity of the written agreement from false claims of modification does not arise. In that case, not only may past oral discussions be relied upon to test the alleged modification, but the actions taken may demonstrate, objectively, the nature and extent of the modification. <u>Id.</u> at 344. There, the conduct of the parties showed an "indisputable mutual departure from the written agreement." <u>Id.</u>

The principle of equitable estoppel may also apply in this situation.

> Once a party to a written agreement has induced another's significant and substantial reliance upon an oral modification, the first party may be estopped from invoking the statute to bar proof of that oral modification ... conduct relied upon to establish estoppel must not otherwise be compatible with the agreement as written.

<u>Id.</u> (citations omitted).

The court found that the sellers had knowingly acquiesced while the purchasers continued to perform and the sellers' conduct showed their agreement to the modification. The "sellers actively lulled purchasers into thinking the oral modification had been accepted." <u>Id.</u> at 346.

Assuming for the sake of argument that this analysis is called for, the court finds the modification (1) made Debtor a

-34-

party to the Agreement; and (2) broadened the covered transactions from a sale of securities to a secured debt financing. Beyond doubt, Foster knew that Melting Point was searching for financing for Debtor, encouraged it, and actively participated in the process over approximately two years. Melting Point reasonably relied on Foster's active encouragement to continue down this path and diligently searched for parties interested in providing financing to Debtor. Viewed in the context of the evidence admitted at trial, Debtor's technical arguments based on the "no oral modification" language of the Agreement simply don't work. There is substantial uncontradicted evidence that supports a finding that the Agreement was orally modified to include debt financing for Debtor. As so modified, the Agreement was fully performed by Melting Point because it introduced Crestline which resulted in the $18.6 million in DIP Financing. The oral modification to the Agreement is not otherwise compatible with the Agreement as written. Thus, §15-301 does not provide Debtor a defense.

### 3. California Law

If the Agreement is not enforceable or not applicable,[14] Melting Point's alternative theory is that under California law, it is entitled to reasonable compensation using certain equitable theories. Debtor counters that the DIP Financing was a real estate transaction and California's real estate licensing rules preclude Melting Point receiving payment. Chillingly, despite the

---

[14] In that event, New York law is irrelevant. Debtor's reliance on <u>Eagle Technology v. Expander Americas, Inc.</u>, 783 F.3d 1131 (8th Cir. 2015) is misplaced.

Case: 16-31367   Doc# 566   Filed: 03/28/19   Entered: 04/01/19 11:58:19   Page 35 of 41

fact that he is a fiduciary here, VanderLey suggested to Haas that seeking to be paid might expose Haas to criminal liability because he lacked a California real estate license. *Day Two, Haas testimony, 86:22-87:9.* Assuming only for the sake of argument that California law is relevant, the court concludes that Melting Point is correct and California law does not prevent allowance of Melting Point's Claim.

California law defines a real estate broker as one who, expecting compensation, solicits borrowers or lenders for or negotiates loans or performs services for borrowers or lenders in connection with loans secured directly or collaterally by liens on real property or on a business opportunity. Cal. Bus. & Prof. Code §10131(d). California law also provides that no person acting in the capacity of a real estate broker shall bring or maintain any action to collect compensation for the performance of this sort of act without proving he or she is duly licensed. Cal. Bus. & Prof. Code §10136.

There are several reasons why Debtor's licensing argument fails. First, Melting Point introduced Crestline in 2015 as a potential purchaser of limited partnership interests and again in 2017 as a potential party to finance a general partner restructuring. Neither of these is a real estate transaction covered by these sections.

Second, Melting Point is a licensed securities broker and Haas has certifications covering debt and equity offerings, among other things. *Day Two, Haas testimony, 40:17-41:4.* Section 10131 does not apply to a broker-dealer or agent of a broker-dealer licensed by the Commissioner of Corporations under the provisions

-36-

of the Corporate Securities Law of 1968. Cal. Bus. & Prof. Code §10131.3; <u>All Points Traders, Inc. v. Barrington Associates</u>, 211 Cal.App.3d 723, 733 (1989) (securities transactions which are neither real estate or business opportunity transactions are exempt under §10131).

Third, to the extent this was a covered real estate transaction, there is a well established exception to the licensing requirement for one who "simply finds and introduces two parties to a real estate transaction." <u>Tyrone v. Kelly</u>, 9 Cal.3d 1, 8 (1973). The testimony at trial supports the conclusion that this is what Melting Point did. Its role was confined: it introduced Crestline to Debtor, initially to acquire limited partner interests in Debtor, and then to provide liquidity in the form of a general partner restructuring. Haas testified that he had no expertise in debtor-in-possession financing. He had, however, spent considerable time working with Foster on Debtor's precarious financial situation and no doubt had more than passing familiarity with Debtor's planned real estate development project.

Debtor's effort to portray Melting Point as exceeding this finder's fee exception simply fails. Neither VanderLey nor Foster testified convincingly that Haas *negotiated* the DIP Financing. All they were able to recall was that Haas attended one or two meetings at which it was discussed and it was clear that Haas had no expertise - and disclaimed any such expertise - in the area of debtor-in-possession financing or real estate financing. *Day Two, Haas testimony, 71:10-17.* Claiming Haas "acted like a broker" without a single specific example of something he said or did is

-37-

simply insufficient when viewed in the context of the evidence adduced at trial. And the many email exchanges between Haas and Foster show the limited role Melting Point played - it was an intermediary, no more, no less.

It is worth noting that ForceTen, through VanderLey as Debtor's Chief Restructuring Officer, took complete credit for negotiating and closing the DIP Financing. *Dkt. No. 452,* (ForceTen First and Final Fee Application, 4 (CRO developed and executed a process to identify and negotiate DIP financing package ... DIP financing sought, negotiated and closed by Debtor under CRO's direction...); 9-10 (financing category, CRO estimated monthly fee $225,000, estimated time allocation 45% of total time, additional personnel $39,845, 100.1 hours)).[15] ForceTen also received a $500,000 bonus on the DIP Financing. It is hard to square VanderLey's vague claim that Haas *negotiated* the DIP Financing with ForceTen's claim in this Fee Application that VanderLey deserves sole credit for it.

There are many cases cited by Debtor in which this finder's exception is discussed. The outcome in these cases is necessarily fact-driven and they are only of limited utility.[16] As the

---

[15] The Fee Application also says ForceTen analyzed all proofs of claim and advised counsel regarding objections. *Dkt. No. 452, 8-9.* ForceTen's gap claim shows it spent roughly 45 hours reviewing Debtor's general ledger and other records in order to prepare the Schedules. *Claim No. 32.* The general ledger showed Debtor's reimbursement of Melting Point. *Ex. A.* However, Melting Point was not included in Schedule E/F which was filed when VanderLey was aware of the issues regarding Melting Point's fee. *Dkt. No. 64-3.*

[16] *See* <u>Greenlake Capital v. Bingo Investments</u>, 185 Cal. App. 4th 731 (2010); <u>Indep. Cellular Tel. Inc. v. Daniels & Assocs.</u>,

-38-

California Supreme Court has explained, if the one seeking payment "helps to conclude the transaction by taking part in negotiating the details of the transaction, compromising or composing differences between the parties, by way of example, he may not recover the agreed compensation." <u>Tyrone v. Kelley</u>, 9 Cal.3d 1, 11-12 (1973). Debtor failed to establish that Haas did any of these things. In short, assuming only that the DIP Financing qualifies as a real estate transaction, the licensing rules do not preclude recovery here.

Finally, in <u>Tenzer v. Superscope</u>, 39 Cal. 3d 18 (1985), the California Supreme Court found that where the party seeking compensation as a finder could establish that he had been deliberately misled by a promise of compensation, the doctrine of estoppel to plead the statute of frauds may be applied to prevent either unconscionable injury or unjust enrichment. <u>Id.</u> at 27. (Unlike this case, in <u>Tenzer</u>, the California statute of frauds in Civil Code §1624 was relevant because the transaction involved a real estate sale.)

Where services are rendered by one party from which another derives benefit, the law presumes an obligation to pay the reasonable value of the services. <u>Carey v. Cusack</u>, 245 Cal.App.2d 57 (1966). The two percent fee Melting Point wants is a reasonable fee here especially in light of the fact that ForceTen initially asked for a five percent fee on any DIP financing and was paid a bonus of $500,000.

---

863 F. Supp. 1109 (N.D. Cal. 1994); <u>Lyons v. Stevenson</u>, 65 Cal. App. 3d 595 (1977); <u>Crofoot v. Spivak</u>, 113 Cal. App. 2d 146 (1952).

Case: 16-31367   Doc# 566   Filed: 03/28/19   Entered: 04/01/19 11:58:19   Page 39 of 41

**IV. Conclusion**

For the foregoing reasons, Melting Point has sustained its burden of persuasion. Debtor's objection to the Claim is overruled and the Claim shall be allowed as requested: $372,000 based on two percent of the $18.6 million DIP Financing, plus interest as provided in the Plan. Melting Point is also entitled to its attorneys' fees of $228,484.54 and expenses of $9,750 as shown in the Declaration of Tobias S. Keller (*Dkt. No. 564*). The court will afford Debtor an opportunity to review the requested fees and file an objection within ten days of entry of this Memorandum Decision if it thinks an objection is warranted. If an objection is filed, the court will address its merits at a later time. If no objection is timely filed, these fees and expenses will be allowed. The court requests that Melting Point promptly submit an order consistent with this Memorandum Decision.

\*\*\*\*\*\*\*\*\*\*\*\*\* End of Memorandum Decision \*\*\*\*\*\*\*\*\*\*\*\*

1  Court Service List:
2  None required.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28